Norman SANDOW, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–89–053–CR.

Court of Appeals of Texas,
Austin.

April 4, 1990.

Linda Icenhauer–Ramirez, Robert Icenhauer–Ramirez, Austin, for appellant.

Ronald Earle, Dist. Atty., Patricia H. Robertson, Dayna Blazey Baird, Asst. Dist. Attys., for appellee.

Before SHANNON, C.J., and SMITH * and ·JONES, JJ.

JONES, Justice.

A jury convicted Norman Sandow, appellant, of the offense of injury to a child and assessed punishment at forty-five years imprisonment. By this appeal, appellant brings eight points of error, complaining of the admission into evidence of a statement by appellant; the admission of testimony from two witnesses impeaching the prior testimony of another witness; the failure of the jury charge to treat injury to a child as a result-oriented offense; the admission of two post-autopsy photographs; the admission of testimony impeaching appellant on an allegedly collateral issue; and the insufficiency of the evidence to support the conviction. We will affirm the trial court's judgment.

On the morning of January 12, 1987, at approximately 11:50 a.m., an Emergency Medical Service (EMS) unit of the Austin Fire Department responded to a call at appellant's residence. On arriving at the residence, paramedics found appellant's wife sitting on a sofa with the body of her four-and-a-half-month-old baby, David, in her arms. Appellant and his five-year-old stepson, Joey Hagi, were also present in

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003 (1988).

the room. EMS personnel concluded that the baby had been dead for quite some time, as his body was cold and rigor mortis had already set in. They noticed some contusions on the left eye and eyelid and on the upper lip.

Rebecca Sandow testified that she was the baby's mother and appellant's wife. On the day before the baby's death, Rebecca had taken him to the doctor because he had a cold. The baby was examined by Dr. Susan Penfield, who determined that he had an upper-respiratory-tract infection and an ear infection. During the course of her examination, the baby was undressed and his body thoroughly examined. He showed no signs of physical abuse and appeared to be a happy, social infant. Penfield testified that no part of her exam should have caused him any physical trauma. Penfield gave Rebecca a prescription for antibiotics and nose drops.

That evening appellant arrived home from work at approximately 5:00 p.m. Rebecca was preparing dinner and the baby was asleep in his crib. Rebecca and appellant spent the evening playing Monopoly and watching television. Rebecca put Joey to bed at 8:00 p.m. while appellant went to the store to purchase milk for the baby and beer for himself.

At approximately 10:00 p.m. Rebecca went to bed because she was not feeling well. Shortly thereafter, the baby, whose crib was in her room, woke up and began crying. Rebecca picked the baby up and took him into the kitchen, where appellant was already fixing him a bottle. She left the baby with appellant and went back to bed. Rebecca came back out of her room a short time later and asked appellant to give the baby some nose drops. Appellant was sitting on the love seat holding the baby. Rebecca returned to the bedroom and went to sleep.

Appellant testified that he sat on the couch and fed the baby. The baby was fussy and would not take much of his bottle. The baby quit crying, became interested in watching television and soon fell asleep on the love seat. Appellant laid the baby on the cushion of the love seat and propped up another cushion so he would not roll off. Appellant testified that he fell asleep on the couch, where he remained until he received a telephone call the next morning from a co-worker. He told the co-worker he was sick and would not be going to work that day. Joey was awake at this time, and appellant instructed him to give some work orders to a man who would be coming by to pick them up. Appellant said he then went into the bedroom and got into bed with his wife.

Joey testified that in the morning he was watching television when the appellant walked into the room and went to David, who was lying on the love seat, and turned him over. Appellant then left the room and went back to bed. Joey stated that David did not cry when he was turned over. He saw blood on the baby's eye, cheek, and mouth. After appellant went back to bed, Joey went into the bedroom and woke his mother up. Joey stated that he did not hurt David, nor did he see anyone else hurt him.

Rebecca testified that Joey came into the bedroom at approximately 10:00 a.m. and woke her up. She went into the living room, where she saw the baby lying on the love seat. He appeared to have rings around his eyes. She immediately picked him up, whereupon she knew something was wrong. She became upset and called for appellant, who came out of the bedroom. Rebecca said that in holding David she knew he was dead because he was cold to the touch. Rebecca and appellant sat on the couch and held David's body for a long time before calling the EMS emergency number.

Dr. Robert Bayardo, the Travis County Medical Examiner, testified that he performed an autopsy on David during the afternoon of January 12, 1988. Bayardo testified that the baby had abrasions on his left upper and lower eyelids that appeared to be similar to carpet burns. The frenulum of his upper lip had been severed, which he stated was consistent with a blow to the face with the palm of the hand. He had further sustained a bruise on his right hip, which was likely to have been caused

by a blow with a blunt instrument. The baby's mesentery (a tissue that carries the blood vessels to the intestines) had a one inch bruise at its root. This injury was fresh and there were no signs of healing, indicating that the injury occurred around the time of death. Bayardo testified that to cause this type of injury a great deal of force must have been applied to the baby's abdomen. Bayardo also stated that he found a bilateral subdural hematoma covering most of the baby's brain and extending down toward the base of the brain. He theorized that once the bleeding in the brain began it took between two and three hours before it actually caused death. Bayardo stated that this type of injury is commonly associated with shaking a baby so forcefully that his head snaps back and forth, causing the brain to shift violently inside the skull and thereby lacerating veins inside the skull. He surmised that the baby died from a bilateral subdural hematoma caused by severe shaking. He estimated the time of death to be around 2:00 a.m.

Dr. Linda Norton, a forensic pathologist, testified that she reviewed the autopsy report and other evidence in the case, including autopsy photographs, police reports, and witness statements. She concluded that the abrasions on the baby's eyelids were probably caused by the child being slammed into an object or surface that had a slightly rough pattern. The bruise on the baby's hip was most likely not self-inflicted, since the child was not mobile enough to injure himself by falling into something. Norton testified that the lacerated frenulum was a common type of injury in child-abuse cases and is often caused when a child is backhanded. The injury to the mesentery occurred, she stated, when the abdomen was struck with a sharp, hard blow. Norton stated that a five-year-old child would not have sufficient strength to cause this type of injury. She characterized the head injury as being of a type usually resulting when a moving head hits a stationary object. She associated this type of injury with children falling from a two- or three-story building, being ejected from a speeding vehicle during a severe car accident, or an adult throwing a child as hard as possible into a wall or the floor. She stated that a five-year-old child would not have sufficient strength to throw a four-month-old baby with enough force to cause this type of injury. Norton concluded that David was killed when he was picked up and either thrown or slammed with a considerable amount of force into a hard, flat surface.

■ In point of error number one, appellant complains of the admission into evidence of an oral statement made by appellant to a Department of Human Services caseworker, contending that the prosecutor violated a pretrial discovery order.

Prior to trial, the trial court apparently granted appellant's motion to require the State to inform appellant of "any oral statements purportedly made by Defendant to any employee, agent or elected official of the State of Texas or subdivision thereof or of the United States government, concerning the events of the alleged offense herein." At trial, Elaine Carlson, a caseworker with the Department of Human Services, testified that after the baby's death she spoke with appellant in her office. At this point, appellant's counsel objected to her testifying as to any statement appellant made to her, on the ground that the State had, in violation of the trial court's discovery order, failed to provide appellant with that information. The prosecutor responded by stating that she thought she had allowed appellant to discover the statement and that she had told him who the witness was and the matters about which she would testify. The court then directed the prosecutor to provide appellant with a narrative of the conversation and asked appellant's counsel if he would like the court to recess. Appellant's counsel agreed to the recess. The jury was then excused, and the trial court stated, "That's all right. It [the statement] should have been furnished to you. There is no question about it. I'm going to give you time." After the recess, the prosecutor resumed questioning Ms. Carlson regarding her interview with appellant. No fur-

ther objections were made by appellant's counsel to this line of questioning.

The State argues that appellant waived his complaint by failing to obtain an adverse ruling from the trial court on his initial objection and by failing to object when the evidence was subsequently introduced. In support of its argument, the State cites *Darty v. State*, 709 S.W.2d 652 (Tex.Cr.App.1986), holding that the admission of evidence over objection does not imply an adverse ruling. We agree with the State that error has not been preserved. If the trial court's statements cannot be construed as a response to appellant's objections, then under *Darty*, error was not preserved. Moreover, the trial court's statements in response to the objection imply that the trial court actually sustained appellant's objection and granted appellant additional time to prepare for cross-examination of the witness. Appellant did not object to this procedure or argue that any harm caused by the State's failure to produce the statement earlier could not be cured by the recess. Therefore, appellant waived any complaint about the court's action. Tex.R.App.P.Ann. 52(a) (Pamph. 1990). Appellant's first point of error is overruled.

■ In his second point of error, appellant contends the trial court erred in admitting into evidence the impeachment testimony of Karen Knox as to a prior statement made by Joey Hagi to Ms. Knox, on the ground that a proper predicate had not been laid for its admission.

Prior to trial, Knox, a social worker, had conducted a videotaped interview session with Joey in which she asked him about the events surrounding David's death. Before Joey was allowed to testify, he was questioned by the prosecutor outside the presence of the jury to establish his competency as a witness. As part of this questioning, the prosecutor, Ms. Robertson, asked him whether he remembered telling "Karen" various things "when you made the movie." The prosecutor then asked Joey if he remembered telling "Elaine" that David fell off the couch. Elaine Carlson, a DHS caseworker, was not involved in the video-

taped interview. Joey answered this last question, "Yes."

On direct examination, the prosecutor did not ask Joey about any statements he made to Karen Knox, nor did she ask him about any statements he made on the videotape or "movie." On cross-examination, however, defense counsel, Mr. Sheppard, asked the following:

Q. Do you remember back when you did a videotape?

A. Yes.

Q. Okay. And do you remember saying on the videotape that David fell off the couch?

A. No.

Later during the trial, the State called Karen Knox as a witness and asked her if, during the videotaped session, Joey had told her that David fell off the couch. Over appellant's counsel's objection that the prosecutor had not, in her earlier questioning, informed Joey of when, where, and to whom the statement had allegedly been made, the trial court allowed Knox to testify that Joey had indeed made such a statement to her during the videotape.

The Texas Rules of Criminal Evidence provide that before a witness may be impeached by extrinsic evidence of a prior inconsistent statement, "the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be offered an opportunity to explain or deny such a statement." Tex.R.Cr.Evid. Ann. 612(a) (Pamph.1990); *see also McGary v. State*, 750 S.W.2d 782, 786 (Tex.Cr.App.1988). Rule 612(a) also provides that "[i]f the witness unequivocally admits having made such a statement, extrinsic evidence of the same shall not be admitted."

In the instant case, the State asked Joey, on voir dire examination, about a number of statements he made to Karen Knox, but failed to ask about this particular statement. However, defense counsel did ask Joey if he remembered saying on the videotape that the baby fell off the couch, and Joey denied remembering the statement. The requirement that the witness be told

the time, place, and person to whom the prior statement was made was satisfied by defense counsel's question. The record indicates that Joey only made one videotape concerning the incident, and it was made by Karen Knox. Therefore, when Joey was asked if he remembered making a statement on the videotape, he was effectively asked if he remembered making a statement to Karen Knox at the time and place the videotape was made. We conclude that a sufficient predicate was laid to allow the introduction of the impeachment evidence. Appellant's second point of error is overruled.

In his third point of error, appellant complains that the trial court erred in allowing testimony by Judy Carter, the Sandows' downstairs neighbor, to impeach a prior statement by Joey Hagi. On direct examination, the prosecutor asked Joey the following:

Q. [By Ms. Robertson] Are you afraid of your dad?

A. No.

Q. Were you afraid of him back then?

A. No.

Q. Do you remember telling *Elaine Carlson* that you were afraid of him because you thought he would do the same thing to you?

A. No.

. . . .

Q. Do you remember telling anybody that you're afraid of your dad?

A. No.

(Emphasis added.)

Later during the trial, the State called Judy Carter to testify. During her direct testimony, the following exchange took place:

Q. [By Ms. Robertson] And did you have a discussion with Joey—

A. . Yes, ma'am.

Q. —about what had happened?

A. Yes, ma'am.

Q. What did he tell you?

MR. SHEPPARD: Objection, Your Honor, hearsay.

MS. ROBERTSON: Your Honor, I have a very specific question I want to ask Mrs. Carter about what Joey told her, and I'd asked Joey this question yesterday.

THE COURT: As to what someone told her, it's hearsay.

MS. ROBERTSON: Yes, sir. But I believe Joey had made a statement yesterday which is—

. . . .

MS. ROBERTSON: Your Honor, I'm intending to introduce Joey's prior inconsistent statement under Rule 612. He denied making a statement yesterday that Judy Carter is prepared to testify to today, and it would be a prior inconsistent statement.

THE COURT: All right. Well, you're trying to impeach a prior witness?

MS. ROBERTSON: Yes, Your Honor.

THE COURT: Well, you haven't asked your questions properly.

MS. ROBERTSON: Well, I've already asked Joey Hagi the proper questions, Your Honor. I think that Mrs. Carter can testify to—I can ask it very specifically, but I think she can testify to what it is—

THE COURT: Well, if it's for the purpose of impeaching a prior witness, it's admissible.

MR. SHEPPARD: Well, what she asked Joey Hagi, I believe, was did he remember saying certain things to this witness and he said, no, he didn't remember that. I don't think that qualifies as a direct refutation having said that. It cannot be ambiguous on the part of the witness as to whether or not they made the prior inconsistent statement, and that is an ambiguous statement. He has to deny having made the statement before she can impeach it and prove it up with extraneous evidence, and that's the rules, Judge.

THE COURT: I'll overrule the objection. Have the jury come in.

MR. SHEPPARD: Well, I object to this testimony on evidence Rules 611, 12, 13 and 14.

THE COURT: Yes. I'm admitting it for the purpose of impeaching the witness. Have the jury come in.

....

Q. (By Ms. Robertson) Mrs. Carter, do you recall Joey telling you about whether or not he was afraid of his stepfather?

A. Yes.

Q. Can you relate to the jury what he told you about being afraid?

A. That he was scared it would happen to him.

Q. Were those his words?

A. Yes, ma'am.

Q. And do you know what he was referring to?

MR. SHEPPARD: Objection, Your Honor. That calls for speculation on her part.

THE COURT: Sustained.

MS. ROBERTSON: Your Honor, I'm trying to put it in the context of the question for what she said prior to him saying that. That's all.

MR. SHEPPARD: She can ask those questions, but she can't ask this woman to speculate on anything.

THE COURT: All right. Let's proceed.

Q. What had you said right before that, Mrs. Carter?

A. I asked Joey what happened, and he told me what he knew, that he had at one point went and told his dad and mom that the baby was crying and he seen blood. He told me that Norman, the father of the baby, came out and turned the baby over and told Joey to go back in his room. That's when Joey told me that he thought someone had broke into the house because he heard things breaking. He opened his bedroom door, you know, to an extent of a crack to where he could see out. He saw what happened, but he wasn't going to tell me because he was scared it would happen to him.

Appellant argues on appeal that the trial court erred in allowing this impeachment testimony because the proper predicate was not laid. A review of the testimony shows that Joey was never asked about any statements he made to Judy Carter; he was never afforded an opportunity to deny making the statement or to reconcile it with his oral testimony as required by Rule 612.

■ Initially, we must review the record to see if appellant preserved error in the trial court. Generally, an error in the examination of witnesses or the admission of evidence is not preserved for appellate review absent a timely and specific objection at trial; such an objection must not only identify what is objected to, but must also set forth specific grounds for the ruling desired. *Cisneros v. State*, 692 S.W.2d 78, 82–83 (Tex.Cr.App.1985); Tex.R.App.P. Ann. 52(a). The purposes of a trial objection are as follows:

> First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony.

*Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Cr.App.1977).

Here, appellant's first objection was that the prosecutor's question called for a response consisting of hearsay. This objection was sufficient when made. However, the State countered the hearsay objection by limiting the offer to impeachment purposes. Introduced for that purpose, the testimony would not constitute hearsay because it would not be offered to prove the truth of the matter stated. Tex.R.Cr.Evid. Ann. 801(d). This limited offer had the effect of putting the burden back on appellant to make a specific objection to the impeachment testimony. Appellant did this by objecting that the use of the prior inconsistent statement was improper because Joey had not directly denied having made the statement, but had merely said that he did not remember having made it. Although that objection was specific enough to preserve asserted error on the ground specified, it was not a correct statement of Texas law. *See Miller v. State*, 666 S.W.2d

269, 274 (Tex.App.1984, pet. ref'd); *cf. McGary*, 750 S.W.2d at 786 n. 3.

■ Moreover, appellant's complaint on appeal is that the predicate was not satisfied because the witness was not told the time, place, and person to whom the statement was made; however, the objection at trial was that the predicate was not laid because the witness did not unequivocally deny having made the prior statement. It is well settled that, to preserve error, a point of error on appeal must comport to the objection voiced at trial. *Thomas v. State*, 723 S.W.2d 696, 700 (Tex.Cr.App.1986).

■ Finally, appellant objected to the testimony based on "evidence Rules 611, 12, 13 and 14." This objection is nothing more than a general objection. The naming of a series of evidentiary rules without an explanation of how the rules are applicable is not sufficient to preserve error, even if one of the rules might apply, because it fails to state the specific grounds for the objection. Tex.R.App.P. Ann. 52(a). The admission of evidence over such a general objection is not error.

■ We also conclude that the trial court's statement that the State had failed to "ask[ ] your questions properly" cannot be sufficient to preserve error for appellant. A party that objects to the introduction of evidence must make its own objections in order to preserve error. Tex.R.App.P. Ann. 52(a). A trial court's criticism or query cannot replace an opposing party's objection. The opposing party must object in order to draw the trial court's attention to the problem as viewed by the objecting party and to provide the trial court with a basis on which to make a ruling. Therefore, we conclude that the trial court's statement did not preserve error on this issue.

■ Courts have created a number of exceptions to the general rule that a party cannot, on appeal, complain of the overruling of a general or imprecise objection. One of these is that "where the correct ground of exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection." *Zillender*, 557 S.W.2d at 517; *see also* Tex.R.App.P. Ann. 52(a) (opponent not required to state specific ground for desired ruling if specific ground was apparent from the context). "Thus, to the extent that an appellate record adequately shows that the trial judge and opposing counsel were aware of the substance of a defendant's objection, thereby meeting the purpose of an objection, [a general or imprecise] objection preserves the complaint for appellate review." *Thomas*, 723 S.W.2d at 700–01.

The exception does not apply in the present case. Appellant did not, as to this testimony, specifically object that the witness had not been told the time, place, and person to whom the statement was allegedly made. Nor does the record adequately show that the trial court's attention was drawn to that particular deficiency. The trial judge indicated that the State had not asked its questions properly, but he did not explain why he thought the questions were deficient. Moreover, it is not clear from the record which questions the trial court thought had been improperly asked. The trial court could have meant that the prosecutor had merely failed to ask Judy Carter the impeachment question properly. Also significant is the fact that the general objection followed immediately after a related, but incorrect, specific objection. In short, we conclude that the record shows neither that the trial court was aware of the substance of the objection, nor that the specific grounds were apparent from the context. Appellant's third point of error is overruled.

■ In his fourth point of error, appellant contends that the trial court's charge to the jury on guilt-innocence was defective because it failed to limit the definitions of the culpable mental states of "intentionally" and "knowingly" to the *result* of the offense. We agree that under the Court of Criminal Appeals' holding in *Alvarado v. State*, 704 S.W.2d 36 (Tex.Cr.App.1985), the trial court erred in submitting the charge in this fashion. However, appellant did not object to the charge. Therefore, appellant

must claim fundamental error and show egregious harm; that is, that he was denied a fair and impartial trial as a result of the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984). In determining whether egregious harm occurred, the error should be viewed in light of the entire jury charge, the state of the evidence (including contested issues and weight of probative evidence), the argument of counsel, and any other relevant information revealed by the record. *Id.*

Appellant contends that the jury charge enabled the jury to convict only if they believed he engaged in the conduct knowingly or intentionally. However, there is no evidence that appellant struck or otherwise maltreated the child *without* the intent to cause serious bodily injury. On the contrary, appellant denied abusing the child at all. Therefore, the jury could not have been misled by the erroneous charge. *See Spang v. State*, 781 S.W.2d 713, 715 (Tex. App.1989, no pet.) Further, in her final argument, the prosecutor did not compound the error by telling the jury they could convict if they found appellant had intentionally or knowingly engaged in the conduct that caused the injuries. In light of the record as a whole, we do not find egregious harm. Appellant's fourth point of error is overruled.

In points of error five and six, appellant contends that the trial court erred in admitting into evidence two photographs taken during the autopsy. State's exhibit 49 depicts the victim's abdomen opened to expose the injured mesentery. State's exhibit 53 depicts the victim's skull opened to expose the injured brain.

■ The Court of Criminal Appeals, in 1972, set out a general rule regarding the admission of photographs into evidence:

> [I]f a photograph is competent, material and relevant to the issues on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury.

*Martin v. State*, 475 S.W.2d 265, 267 (Tex. Cr.App.1972). The admission in evidence of photographs rests in the discretion of the trial court, which determines whether the photographs serve to enlighten the jury. The court's decision will not be disturbed on review in the absence of a showing of an abuse of discretion. *Terry v. State*, 491 S.W.2d 161, 163 (Tex.Cr.App. 1973). "[W]here pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime, a trial judge does not abuse his discretion in admitting these photographs." *Harris v. State*, 661 S.W.2d 106, 107 (Tex.Cr.App. 1983).

■ Before an autopsy or post-autopsy photograph is admitted to aid the jury in understanding a pathologist's testimony, the pathologist should point out the relevant aspects of the photograph and distinguish the depicted injury from the effects of the autopsy. "The jury, in the absence of the explanation of isolated areas pointed out by the expert witness, sees only severed parts of a human body." *Terry*, 491 S.W.2d at 164. However, there may be instances where the injury is so readily distinguishable from the effects of the autopsy, that no expert testimony is needed to aid the jury's understanding. *See Izaguirre v. State*, 695 S.W.2d 224 (Tex.App. 1985, no pet.).

■ Autopsy photographs can be admitted to help the trier of fact decide any issue that is material to the outcome of the case. Often, as in *Harris*, they are admitted to show the victim's cause of death, but they may also be relevant to other issues, such as the assailant's identity or culpable mental state. *See Burdine v. State*, 719 S.W.2d 309, 317 (Tex.Cr.App.1986).

Prior to the introduction of State's exhibit 53, the testifying pathologist testified that the victim's death was caused by a subdural hematoma. In addition, the pathologist, with the use of drawings and diagrams, explained that a subdural hematoma is a bleeding in the skull that compresses the brain. State's exhibit 53 shows the victim's brain with a pool of blood in a depressed area near the forehead. The

photograph enabled the jury to see the injury that resulted in the child's death.

■ Appellant argues that the cause of death was not at issue in the case, and therefore, the photograph should have been excluded. We are not persuaded that the cause of death was not at issue. Even if it was not, however, the identity of the assailant was, and the pathologist testified that the type of injury illustrated by this photograph could be caused only by an adult. The trial court did not abuse its discretion in admitting State's exhibit 53.

■ The pathologist also testified that the autopsy showed the infant had suffered a bruise on the mesentery, the tissue near the spine that carries the blood vessels to the intestines. He further testified that the bruise resulted from a high degree of force, such as an adult poking the child, inflicted near the time of death. State's exhibit 49 depicts the child's abdomen opened up to reveal a dark spot, which resembles a bruise, near the spine. The photograph is relevant to prove the identity of the assailant. In addition, the pathologist's testimony sufficiently aids the jury in distinguishing between the injury and the effects of the autopsy. The trial court did not abuse its discretion in admitting the photograph. Appellant's fifth and sixth points of error are overruled.

In point of error seven, appellant contends that the trial court erred in allowing the State to impeach him on a collateral issue, specifically whether he drank a quart of beer every day at lunch.

During his testimony, appellant stated that on the night of the child's death, he had drunk four or five beers. On cross-examination, the prosecutor asked appellant if he had a habit of drinking beer at lunch. Appellant admitted drinking beer at lunch occasionally but denied that it was a habit. The prosecutor then asked appellant if he ever drank a quart of beer at lunch. Appellant admitted that he had, but that he was not sure how many times he had drunk a quart of beer at lunch. Later, the State, over appellant's objection, asked one of appellant's co-workers about appellant's lunchtime drinking behavior. The witness testified that appellant drank a quart of beer at lunch every day.

■ When a witness is cross-examined on a collateral matter, the cross-examining party may not then contradict the witness's answer; a matter is collateral if the cross-examining party would not be entitled to prove that matter as part of his case tending to establish his plea. *Shipman v. State*, 604 S.W.2d 182, 184 (Tex.Cr.App. 1980).

■ In the present case, however, the impeachment testimony did not involve a collateral issue. Whether appellant habitually consumed a quart of beer at lunch was material and relevant to show his degree of intoxication on the evening in question. Whether appellant consumed a quart of beer at noon, in addition to the four or five beers he admitting drinking that evening, is relevant to his mental and physical condition at the time of the baby's death. Appellant's seventh point of error is overruled.

■ In point of error eight, appellant contends that the evidence is insufficient to show that he committed the offense. The standard for reviewing the sufficiency of the evidence is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Cr.App.1984). In a case involving circumstantial evidence, such as this one, a conviction cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Cr.App.1984).

■ Appellant argues that the evidence is not sufficient to show beyond a reasonable doubt that it was appellant who injured the child. While it is true that mere presence at the scene of the crime alone is not sufficient to conclude that the accused committed the crime beyond a reasonable doubt, this fact, when combined with other facts linking the accused to the crime, can

be sufficient to determine the accused's guilt. *Johnson,* 673 S.W.2d at 196. Here, the only possible inference that someone other than appellant caused the fatal injuries stems from the fact that Rebecca and Joey were also present in the house. The evidence is uncontroverted, however, that Rebecca went to sleep in a separate room away from the child and did not wake up or have any contact with the baby until late the next morning. Therefore, it is unreasonable to infer that Rebecca caused the baby's death. In addition, two pathologists testified that the baby's injuries could have been inflicted only by an adult, and that five-year-old Joey Hagi would not have had sufficient strength to inflict the injuries that caused David's death. Therefore, the evidence does not give rise to a reasonable inference that someone other than appellant caused serious bodily injury to the victim. Appellant's eighth point of error is overruled.

The judgment of conviction is affirmed.