COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-06-417-CR

 

 

CHRISTOPHER LEON HAMMOND                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM
THE 90TH DISTRICT COURT OF YOUNG COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Christopher Leon
Hammond appeals from his conviction for causing serious bodily injury to a
child.  In one issue, he argues that the
trial court erred by overruling his motion for an instructed verdict of
acquittal.  We affirm.

 








                                       Standard of Review

A challenge to the denial of
a motion for instructed verdict is actually a challenge to the legal
sufficiency of the evidence.  Canales
v. State, 98 S.W.3d 690, 693 (Tex. Crim. App.), cert. denied, 540
U.S. 1051 (2003); McCown v. State, 192 S.W.3d 158, 160 (Tex. App.CFort Worth 2006, pet. ref=d).  When reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the prosecution in order to determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

                                Serious Bodily Injury to a Child

A person commits an offense
if he intentionally, knowingly, recklessly, or with criminal negligence, by act
or intentionally, knowingly, or recklessly by omission, causes serious bodily
injury to a child.  Tex. Penal Code Ann. ' 22.04(a)(1)
(Vernon Supp. 2007).

                                              Evidence








On the morning of July 11,
2005, Appellant and his then-wife, LessaBeth, took their six-month-old son, S.,
to the emergency room at Hamilton Hospital after S. became limp and
unresponsive.  S. was transferred by helicopter
ambulance to Cook Children=s Medical Center in Fort Worth. 

Dr. Todd Wolf, a Cook
Children=s physician, ordered a CAT scan and a chest x-ray, among other tests,
and found that S. had acute and chronic subdural bleeds on the brain and
thirteen rib fractures.  Dr. Wolf
explained that acute blood on the brain is fresh blood that results when a
child has been violently shaken within the previous four days, and chronic
bleeds result from violent shaking that occurred more than four days, and as
long as six weeks, in the past.  Dr. Wolf
testified that there could be a period of Alucidity@ following a
shaking incident during which a baby would appear to be normal, but at some
point the baby would exhibit behavior that reflected the injury, such as
vomiting, irritability, poor responsiveness, or seizures.  When asked by the prosecutor, A[W]hen you=re told that
>I was just picking up the baby and he just went limp and went down= most likely that=s the time when the [traumatic] event occurred?,@ Dr. Wolf answered, ACertainly it could [have been] at that time.  Yes.@ 








Dr. Wolf testified that S.=s broken ribs resulted from a squeezing or compressive force and were
from three to six weeks old.  He
testified that the broken ribs would be painful to the baby and cause
sensitivity in the affected area.  He
said he would expect a child with the number of rib fractures that S. had
sustained to be fussy and cranky and to cry out when touched.  

There was no question in Dr.
Wolf=s mind that S. suffered from Battered Child Syndrome.  When Dr. Wolf relayed his findings to
Appellant and LessaBeth, both of them were very emotional and upset and did not
accuse one another of inflicting harm on S. 


Dr. Jayme Coffman, the medical
director for the child abuse program at Cook Children=s, testified that S. also had metaphyseal fracturesCfractures of the bone growth plateCon both femurs and one humerus. 
The fractures ranged in age from less than one week to three weeks
old.  She concluded that the fractures
resulted from child abuse.  Dr. Coffman
testified that the metaphyseal fractures resulted from considerable force used
to pull, push, and twist S.=s limbs, and the broken ribs resulted from violent squeezing of S.=s rib cage.  She would expect a
child with S.=s injuries
to show discomfort when picked up, and she could not explain why no one noticed
S.=s injuries before July 11.  With
regard to S.=s brain
injuries, Dr. Coffman testified that the injuries would cause some
symptoms.  Contrary to Dr. Wolf=s testimony, she testified that in light of the amount of fresh blood
on S.=s brain, there would be no period of Anormalcy@ between the
traumatic event and the onset of symptoms. 








Charlie Parker, a senior
investigator with the Texas Department of Family and Protective Services (Athe Department@), testified
that he received a referral on July 11, 2005, regarding S.=s injuries.  Parker interviewed
Appellant and LessaBeth the following morning at a Department office.  Both appeared upset, but Appellant was not
nearly as upset as LessaBeth.  Appellant
told Parker that he and LessaBeth were in bed on the morning of July 11 when he
heard S. wake up.  Appellant said that he
changed S.=s diaper,
took him into the living room, fed him a bottle, and unsuccessfully attempted
to burp him.  Appellant told Parker that
S. had a bowel movement and Appellant changed his diaper again.  Appellant said he then successfully burped
S., after which S. spit up.  Appellant
said that he sat S. on a crescent-shaped pillow and started to wipe him
down.  Appellant told Parker that S.
leaned forward, coughed, closed his eyes, and went limp.  When Appellant could not rouse S., he woke
LessaBeth up and they went to the hospital. 








Parker testified that when he
told Appellant and LessaBeth that the Department was going to remove S.,
LessaBeth became extremely upset, but Appellant said Athat he understood, that everything would be okay, and let us do our
job.@  Parker felt that Appellant=s response was inappropriate, and he began to suspect Appellant as the
person who had injured S.  After the
Department removed S. from LessaBeth=s and Appellant=s custody,
LessaBeth was extremely cooperative with the Department=s investigation; Appellant, on the other hand, refused to talk to
Parker, cooperate with the Department, or participate in the Department=s reunification plan, and he did not attend court hearings. 

Parker took photographs of S.
on July 12, 2005; he testified that there was no bruising anywhere on S.=s body.  He said that his
investigation revealed that Appellant had access to S. during the four to six
weeks prior to July 11Cthe time
frame, according to the doctors, in which S. suffered some of his
injuries.  On cross-examination, Parker
testified that Appellant was in school in Oklahoma for part of the four-to-six
week period, from May 30 through June 19, 2005. 
As for the four days preceding July 11, Parker testified that only three
peopleCAppellant, LessaBeth, and LessaBeth=s mother, Judy HeardChad access to S., and Appellant=s work records showed that he did not work on July 8, 9, 10, or
11.  Moreover, Appellant was alone with
S. for an hour or forty-five minutes immediately preceding the onset of S.=s symptoms while LessaBeth slept on the morning of July 11. 








Kevin Byrd, another
Department investigator, was present when Parker interviewed LessaBeth and
Appellant on July 12.  Byrd testified
that when he told the parents that the Department was going to place S. in
foster care, LessaBeth was very upset, but Appellant=s primary concern was the removal=s effect on his job.  S. was
placed with Heard, his grandmother, on August 26, 2005.  LessaBeth completed her psychological
evaluation and service plan by August 26 and was allowed to have supervised
visits with S.  

LessaBeth had divorced
Appellant and remarried by the time of trial. 
She testified that she and Appellant lived on her parents= farm near Olney from the time S. was born until mid-June 2005.  They then moved into an apartment in Olney,
where they were living on July 11. 

LessaBeth testified that in
the two weeks before July 11, she had taken S.Cwho suffered from acid refluxCto doctors in Olney and Wichita Falls for check-ups and to a hospital
for a blood test.  The doctors and
hospital staff did not detect any injuries to S.  The doctor in Wichita Falls performed a full
physical, including manipulating S.=s legs to test his joints; S. did not cry or scream.  She said that when S. was at the hospital for
the blood test, two or three nurses had to hold S. down because Ahe was fighting them@ and screaming so loud that LessaBeth had to leave the room; this was
the only time in S.=s life when
LessaBeth thought someone was inflicting pain on S. LessaBeth never saw any
bruises or other signs of injury on S. 
She said she never saw Appellant Aexplode@ or get
angry at S.  LessaBeth testified that
Appellant took an active role in S.=s care and that she considered him to be a good father. 








LessaBeth said that on the
morning of July 11, she heard S. cryCnot in pain, but simply waking up. 
Appellant got up with S., and LessaBeth lay back down; she heard
Appellant change S.=s diaper,
and then she dozed off.  She said the
next thing she recalled was Appellant coming into the bedroom and saying that
they needed to go to the hospital because S. was choking.  During the forty-five minutes that Appellant
was with S., she did not hear S. cry out in pain or anger.  LessaBeth testified that she went into the
living room and saw S. lying on a pillow and Ahis eyes were just rolled back in his head and he just looked
dead.  He was limp.@ 








LessaBeth testified that she
and Appellant drove S. to the local hospital, from which he was flown by
helicopter to Cook Children=s.  When she and Appellant
arrived at Cook Children=s, Dr. Wolf
told them that S. had been abused.  When
Dr. Wolf left them, LessaBeth asked Appellant if he had  abused S. 
She said that instead of answering, Appellant asked for the car keys
and, when she refused to give them to her, left the hospital for three or four
hours; when he returned, he acted like nothing had happened.  When LessaBeth again asked him if he had hurt
S., AHe never said a word.  He never
accused anybody.  He never said >I didn=t do it.=  He just sat there.@  When the Department informed
them that they were removing S. from LessaBeth=s and Appellant=s care,
LessaBeth Awas very
upset.  I cried and cried and cried.@  But she said Appellant Adidn=t cry.  He didn=t get upset.  He was just angry.@ 

LessaBeth testified that
after their interview with the Department on July 12, Appellant did not return
to their apartment and left all of his possessions there.  When LessaBeth called him on his cell phone, Ahe would scream at [her] and that was it@ and would not tell her where he was. 
Although he was notified of the court hearing following S.=s removal, he did not attend.  

LessaBeth said that Appellant
had a quick temper and would become very upset over little things, but she
never saw him lose his temper with S. 
She testified that she did not hurt S.  


Judy Heard, LessaBeth=s mother, testified that on July 10, Appellant, LessaBeth, and S. went
to her house for lunch.  She did not see
any injuries on S., and he appeared to be happy.  When she saw him at the hospital the
following morning, he appeared Anearly dead.@  Judy testified that Appellant had played an
active role in S.=s care, and
when asked whether she ever saw Appellant act inappropriately with S., she
answered, AAbsolutely
not.@  Until July 11, she never
suspected that someone had injured S. in any way. 

Appellant testified in his
own defense.  He related the events of
July 11 as follows:








I woke up. [S.] was up and I got up.  I went ahead and left LessaBeth -- I decided
already I was going to let her sleep. 
She had been taking care of the baby. 
I was at work and I thought, well, this is my last day here before I go
back on my eleven days [work shift in Graham], so I=ll
just go ahead and get up with [S.].  So I
got up with him, changed his diaper, went into the living room.  I had a bottle ready for him, fed him, burped
him.

 

Like I referred to in my statement, during that
time he had a bowel movement, so I went back and changed his diaper, and I went
back and fed him some more.  And I couldn=t get
a burp out of him the second time around, so I just ‑‑ what I do
with the baby, I just set there.  You
know, I keep him calm or whatever.  The
burp will come out eventually, for me eventually it does anyway.   Anyway, I continued to try to burp him.  I got a little bit of a burp out, so I just
turned [S.] around and just sat there.

 

We were watching Clifford The Big Red Dog.  I remember it very well that morning.  It sticks in my head everyday.  He then spit up.  He threw up and I just ‑‑ you
know, I had it all over the front of me, the front of him, down my leg, and I
just turned around to the bobby pillow, we refer to it, and sat him down on
that pillow and started to wipe him off. 
And at the same time I=m holding ‑‑ he
couldn=t sit
up at the time.  He wasn=t ‑‑
I heard testimony from somebody he ‑‑ you know, he wasn=t
able to sit up at the time.  I held him
with my hand across the chest right here and I reached down to get another burp
cloth to continue wiping him off.  When I
felt ‑‑ my hand over here and my hand over here on this rag, I felt
him lean forward.  And when he leaned
forward, I=m
thinking, okay, he=s
lost his balance or something.  Well, his
eyes, you know, started to shut and he started ‑‑ you know, he just
went limp.  He went limp.  So I picked him back up and I=m
starting to panic.

 








Already I=m kind of suspicion [sic] why
he spit up, threw up, like that, because the ‑‑ I had been informed
over a period of time that I have been gone that we=re lessening
the dosages of the medication for him. 
It=s
getting better.  The doctor said he was
going to grow out of it.  He=s
growing out of it, so, I=m
already, okay, why did he do that.  So I=m
doing that.  He does the bit where he
like leans forward and, you know, tries to pass out on me.  Without any hesitation, without even thinking
twice about it, I knew something was wrong with [S.].  I picked him up.  I ran to the bedroom.  I kicked the door open.  The door was kind of shut in the bathroom,
and I scared LessaBeth and woke her up. 
I just told her, you know, Get in the car.  Take me to the hospital right now.  I was in a pair of boxer shorts and she was
in a nightgown, and we were off to Hamilton Hospital.

 

Appellant testified that he Afell apart@ and was Ahysterical@ when Dr.
Wolf told him and LessaBeth that S. was the victim of abuse.  He said he asked LessaBeth what she had done
to the baby, and she said nothing.  When
she asked him the same question, he said he did not do anything but take care
of S.  Appellant testified that he did
leave the hospital at that point, but he said that he was gone only forty-five
minutes.  He said that he did not
participate in subsequent custody hearings because he did not have
transportation. Appellant testified that he did not participate in the
Department=s service
plan because he never received any paperwork related to it. 

                                             Discussion








The mystery in this case is
how a six-month-old baby could sustain a brain injury, two broken legs, a
broken arm, and thirteen broken ribs and yet none of his care-givers nor two
doctors nor several hospital nurses detected any sign of injury or distress.  But our task is not to solve that mystery; all
we must do is determine whether the evidence is legally sufficient to support
the jury=s verdict.

We hold that the evidence,
when viewed in the light most favorable to the prosecution, would permit a
rational trier of fact to find that Appellant intentionally, knowingly, or
recklessly caused serious bodily injury to S. 
Appellant was alone with S. for the forty-five minutes immediately
preceding the onset of symptoms arising from the second brain injury.  Dr. Coffman testified that the onset of
symptoms would have immediately followed the traumatic event, with no
intervening period of Anormalcy@ during which Appellant could have diapered, fed, and burped S.  Other courts have overruled legal sufficiency
challenges when the defendant was the only person with the injured child at the
time of the injury.  See Bryant v.
State, 909 S.W.2d 579, 583 (Tex. App.CTyler 1995, no pet.); Sandow v. State, 787 S.W.2d 588, 598-99
(Tex. App.CAustin 1990,
pet. ref=d); see also Garcia v. State, 16 S.W.3d 401, 405 (Tex. App.CEl Paso 2000, pet. ref=d) (ATexas case
law is replete with holdings that when an adult defendant has had sole access
to a child at the time its injuries are sustained, the evidence is sufficient
to support a conviction for injury to a child.@).  Although the evidence is
less compelling with regard to S.=s other injuries, it is legally sufficient to support Appellant=s conviction for the second of S.=s two brain injuries.








                                             Conclusion

We overrule Appellant=s sole point and affirm the trial court=s judgment.

 

 

ANNE GARDNER

JUSTICE

 

PANEL F:    CAYCE, C.J.; GARDNER and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 7, 2008

 











[1]See Tex. R. App. P. 47.4.