COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-06-417-CR

CHRISTOPHER LEON HAMMOND APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Christopher Leon Hammond appeals from his conviction for causing serious bodily injury to a child.  In one issue, he argues that the trial court erred by overruling his motion for an instructed verdict of acquittal.  We affirm.

Standard of Review

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
Canales v. State
, 98 S.W.3d 690, 693 (Tex. Crim. App.), 
cert. denied
, 540 U.S. 1051 (2003); 
McCown v. State
, 192 S.W.3d 158, 160 (Tex. App.—Fort Worth 2006, pet. ref’d).
  
When reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Clayton v. State
, 235 S.W.3d 772, 778
 (Tex. Crim. App. 2007).

Serious Bodily Injury to a Child

A person commits an offense 
if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes serious bodily injury to a child.  
Tex. Penal Code Ann. §
 22.04(a)(1) (Vernon Supp. 2007).

Evidence

On the morning of July 11, 2005, Appellant and his then-wife, LessaBeth, took their six-month-old son, S., to the emergency room at Hamilton Hospital after S. became limp and unresponsive.  S. was transferred by helicopter ambulance to Cook Children’s Medical Center in Fort Worth. 

Dr. Todd Wolf, a Cook Children’s physician, ordered a CAT scan and a chest x-ray, among other tests, and found that S. had acute and chronic subdural bleeds on the brain and thirteen rib fractures.  Dr. Wolf explained that acute blood on the brain is fresh blood that results when a child has been violently shaken within the previous four days, 
and chronic bleeds result from violent shaking that occurred more than four days, and as long as six weeks, in the past.  Dr. Wolf testified that there could be a period of “lucidity” following a shaking incident during which a baby would appear to be normal, but at some point the baby would exhibit behavior that reflected the injury, such as vomiting, irritability, poor responsiveness, or seizures.  When asked by the prosecutor, “[W]hen you’re told that ‘I was just picking up the baby and he just went limp and went down’ most likely that’s the time when the [traumatic] event occurred?,” Dr. Wolf answered, “Certainly it could [have been] at that time.  Yes.” 

Dr. Wolf testified that S.’s broken ribs resulted from a squeezing or compressive force and were from three to six weeks old.  He testified that the broken ribs would be painful to the baby and cause sensitivity in the affected area.  He said he would expect a child with the number of rib fractures that S. had sustained to be fussy and cranky and to cry out when touched.  

There was no question in Dr. Wolf’s mind that S. suffered from Battered Child Syndrome.  When Dr. Wolf relayed his findings to Appellant and LessaBeth, both of them were very emotional and upset and did not accuse one another of inflicting harm on S.  

Dr. Jayme Coffman, the medical director for the child abuse program at Cook Children’s, testified that S. also had metaphyseal fractures—fractures of the bone growth plate—on both femurs and one humerus.  The fractures ranged in age from less than one week to three weeks old.  She concluded that the fractures resulted from child abuse.  Dr. Coffman testified that the metaphyseal fractures resulted from considerable force used to pull, push, and twist S.’s limbs, and the broken ribs resulted from violent squeezing of S.’s rib cage.  She would expect a child with S.’s injuries to show discomfort when picked up, and she could not explain why no one noticed S.’s injuries before July 11.  With regard to S.’s brain injuries, Dr. Coffman testified that the injuries would cause some symptoms.  Contrary to Dr. Wolf’s testimony, she testified that in light of the amount of fresh blood on S.’s brain, there would be no period of “normalcy” between the traumatic event and the onset of symptoms. 

Charlie Parker, a senior investigator with the Texas Department of Family and Protective Services (“the Department”), testified that he received a referral on July 11, 2005, regarding S.’s injuries.  Parker interviewed Appellant and LessaBeth the following morning at a Department office.  Both appeared upset, but Appellant was not nearly as upset as LessaBeth.  Appellant told Parker that he and LessaBeth were in bed on the morning of July 11 when he heard S. wake up.  Appellant said that he changed S.’s diaper, took him into the living room, fed him a bottle, and unsuccessfully attempted to burp him.  Appellant told Parker that S. had a bowel movement and Appellant changed his diaper again.  Appellant said he then successfully burped S., after which S. spit up.  Appellant said that he sat S. on a crescent-shaped pillow and started to wipe him down.  Appellant told Parker that S. leaned forward, coughed, closed his eyes, and went limp.  When Appellant could not rouse S., he woke LessaBeth up and they went to the hospital. 

Parker testified that when he told Appellant and LessaBeth that the Department was going to remove S., LessaBeth became extremely upset, but Appellant said “that he understood, that everything would be okay, and let us do our job.”  Parker felt that Appellant’s response was inappropriate, and he began to suspect Appellant as the person who had injured S.  After the Department removed S. from LessaBeth’s and Appellant’s custody, LessaBeth was extremely cooperative with the Department’s investigation; Appellant, on the other hand, refused to talk to Parker, cooperate with the Department, or participate in the Department’s reunification plan, and he did not attend court hearings. 

Parker took photographs of S. on July 12, 2005; he testified that there was no bruising anywhere on S.’s body.  He said that his investigation revealed that Appellant had access to S. during the four to six weeks prior to July 11—the time frame, according to the doctors, in which S. suffered some of his injuries.  On cross-examination, Parker testified that Appellant was in school in Oklahoma for part of the four-to-six week period, from May 30 through June 19, 2005.  As for the four days preceding July 11, Parker testified that only three people—Appellant, LessaBeth, and LessaBeth’s mother, Judy Heard—had access to S., and Appellant’s work records showed that he did not work on July 8, 9, 10, or 11.  Moreover, Appellant was alone with S. for an hour or forty-five minutes immediately preceding the onset of S.’s symptoms while LessaBeth slept on the morning of July 11. 

Kevin Byrd, another Department investigator, was present when Parker interviewed LessaBeth and Appellant on July 12.  Byrd testified that when he told the parents that the Department was going to place S. in foster care, LessaBeth was very upset, but Appellant’s primary concern was the removal’s effect on his job.  S. was placed with Heard, his grandmother, on August 26, 2005.  LessaBeth completed her psychological evaluation and service plan by August 26 and was allowed to have supervised visits with S.  

LessaBeth had divorced Appellant and remarried by the time of trial.  She testified that she and Appellant lived on her parents’ farm near Olney from the time S. was born until mid-June 2005.  They then moved into an apartment in Olney, where they were living on July 11. 

LessaBeth testified that in the two weeks before July 11, she had taken S.—who suffered from acid reflux—to doctors in Olney and Wichita Falls for check-ups and to a hospital for a blood test.  The doctors and hospital staff did not detect any injuries to S.  The doctor in Wichita Falls performed a full physical, including manipulating S.’s legs to test his joints; S. did not cry or scream.  She said that when S. was at the hospital for the blood test, two or three nurses had to hold S. down because “he was fighting them” and screaming so loud that LessaBeth had to leave the room; this was the only time in S.’s life when LessaBeth thought someone was inflicting pain on S. LessaBeth never saw any bruises or other signs of injury on S.  She said she never saw Appellant “explode” or get angry at S.  LessaBeth testified that Appellant took an active role in S.’s care and that she considered him to be a good father. 

LessaBeth said that on the morning of July 11, she heard S. cry—not in pain, but simply waking up.  Appellant got up with S., and LessaBeth lay back down; she heard Appellant change S.’s diaper, and then she dozed off.  She said the next thing she recalled was Appellant coming into the bedroom and saying that they needed to go to the hospital because S. was choking.  During the forty-five minutes that Appellant was with S., she did not hear S. cry out in pain or anger.  LessaBeth testified that she went into the living room and saw S. lying on a pillow and “his eyes were just rolled back in his head and he just looked dead.  He was limp.” 

LessaBeth testified that she and Appellant drove S. to the local hospital, from which he was flown by helicopter to Cook Children’s.  When she and Appellant arrived at Cook Children’s, Dr. Wolf told them that S. had been abused.  When Dr. Wolf left them, LessaBeth asked Appellant if he had  abused S.  She said that instead of answering, Appellant asked for the car keys and, when she refused to give them to her, left the hospital for three or four hours; when he returned, he acted like nothing had happened.  When LessaBeth again asked him if he had hurt S., “He never said a word.  He never accused anybody.  He never said ‘I didn’t do it.’  He just sat there.”  When the Department informed them that they were removing S. from LessaBeth’s and Appellant’s care, LessaBeth “was very upset.  I cried and cried and cried.”  But she said Appellant “didn’t cry.  He didn’t get upset.  He was just angry.” 

LessaBeth testified that after their interview with the Department on July 12, Appellant did not return to their apartment and left all of his possessions there.  When LessaBeth called him on his cell phone, “he would scream at [her] and that was it” and would not tell her where he was.  Although he was notified of the court hearing following S.’s removal, he did not attend.  

LessaBeth said that Appellant had a quick temper and would become very upset over little things, but she never saw him lose his temper with S.  She testified that she did not hurt S.   

Judy Heard, LessaBeth’s mother, testified that on July 10, Appellant, LessaBeth, and S. went to her house for lunch.  She did not see any injuries on S., and he appeared to be happy.  When she saw him at the hospital the following morning, he appeared “nearly dead.”  Judy testified that Appellant had played an active role in S.’s care, and when asked whether she ever saw Appellant act inappropriately with S., she answered, “Absolutely not.”  Until July 11, she never suspected that someone had injured S. in any way. 

Appellant testified in his own defense.  He related the events of July 11 as follows:

I woke up. [S.] was up and I got up.  I went ahead and left LessaBeth -- I decided already I was going to let her sleep.  She had been taking care of the baby.  I was at work and I thought, well, this is my last day here before I go back on my eleven days [work shift in Graham], so I’ll just go ahead and get up with [S.].  So I got up with him, changed his diaper, went into the living room.  I had a bottle ready for him, fed him, burped him.

Like I referred to in my statement, during that time he had a bowel movement, so I went back and changed his diaper, and I went back and fed him some more.  And I couldn’t get a burp out of him the second time around, so I just -- what I do with the baby, I just set there.  You know, I keep him calm or whatever.  The burp will come out eventually, for me eventually it does anyway.   Anyway, I continued to try to burp him.  I got a little bit of a burp out, so I just turned [S.] around and just sat there.

We were watching Clifford The Big Red Dog.  I remember it very well that morning.  It sticks in my head everyday.  He then spit up.  He threw up and I just -- you know, I had it all over the front of me, the front of him, down my leg, and I just turned around to the bobby pillow, we refer to it, and sat him down on that pillow and started to wipe him off.  And at the same time I’m holding -- he couldn’t sit up at the time.  He wasn’t -- I heard testimony from somebody he -- you know, he wasn’t able to sit up at the time.  I held him with my hand across the chest right here and I reached down to get another burp cloth to continue wiping him off.  When I felt -- my hand over here and my hand over here on this rag, I felt him lean forward.  And when he leaned forward, I’m thinking, okay, he’s lost his balance or something.  Well, his eyes, you know, started to shut and he started -- you know, he just went limp.  He went limp.  So I picked him back up and I’m starting to panic.

Already I’m kind of suspicion [sic] why he spit up, threw up, like that, because the -- I had been informed over a period of time that I have been gone that we’re lessening the dosages of the medication for him.  It’s getting better.  The doctor said he was going to grow out of it.  He’s growing out of it, so, I’m already, okay, why did he do that.  So I’m doing that.  He does the bit where he like leans forward and, you know, tries to pass out on me.  Without any hesitation, without even thinking twice about it, I knew something was wrong with [S.].  I picked him up.  I ran to the bedroom.  I kicked the door open.  The door was kind of shut in the bathroom, and I scared LessaBeth and woke her up.  I just told her, you know, Get in the car.  Take me to the hospital right now.  I was in a pair of boxer shorts and she was in a nightgown, and we were off to Hamilton Hospital.

Appellant testified that he “fell apart” and was “hysterical” when Dr. Wolf told him and LessaBeth that S. was the victim of abuse.  He said he asked LessaBeth what she had done to the baby, and she said nothing.  When she asked him the same question, he said he did not do anything but take care of S.  Appellant testified that he did leave the hospital at that point, but he said that he was gone only forty-five minutes.  He said that he did not participate in subsequent custody hearings because he did not have transportation. Appellant testified that he did not participate in the Department’s service plan because he never received any paperwork related to it. 

Discussion

The mystery in this case is how a six-month-old baby could sustain a brain injury, two broken legs, a broken arm, and thirteen broken ribs and yet none of his care-givers nor two doctors nor several hospital nurses detected any sign of injury or distress.  But our task is not to solve that mystery; all we must do is determine whether the evidence is legally sufficient to support the jury’s verdict.

We hold that the evidence, when viewed in the light most favorable to the prosecution, would permit
 a rational trier of fact to find that Appellant 
intentionally, knowingly, or recklessly caused serious bodily injury to S.  Appellant was alone with S. for the forty-five minutes immediately preceding the onset of symptoms arising from the second brain injury.  Dr. Coffman testified that the onset of symptoms would have immediately followed the traumatic event, with no intervening period of “normalcy” during which Appellant could have diapered, fed, and burped S.  Other courts have overruled legal sufficiency challenges when the defendant was the only person with the injured child at the time of the injury.  
See Bryant v. State
, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.); 
Sandow v. State
, 787 S.W.2d 588, 598-99 (Tex. App.—Austin 1990, pet. ref’d); 
see also Garcia v. State
, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref’d) (“Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child.”).  Although the evidence is less compelling with regard to S.’s other injuries, it is legally sufficient to support Appellant’s conviction for the second of S.’s two brain injuries.

Conclusion

We overrule Appellant’s sole point and affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL F: CAYCE, C.J.; GARDNER and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P
. 47.2(b)

DELIVERED:  February 7, 2008

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.