John David CELINSKI, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–94–00988–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 2, 1995.

Discretionary Review Refused Feb. 7, 1996.

Michael P. Fosher, Houston, for Appellant.

John B. Holmes, Jr., William J. Delmore, III, Sunni Mitchell, Houston, for Appellee.

Before ANDELL, HUTSON–DUNN and O'CONNOR, JJ.

## OPINION

ANDELL, Justice.

Appellant, John David Celinski, was charged by complaint and information with the misdemeanor offense of cruelty to animals.[1] He entered a plea of not guilty. The jury found appellant guilty and assessed punishment at confinement in jail for one year, probated for two years, and payment of an $1800 fine. The trial court additionally required appellant to perform 240 hours of community service as a condition of probation. We affirm.

1. Tex.Penal Code Ann. § 42.09 (Vernon 1994).

### Facts

The appellant began sharing a duplex apartment with Sheryl Jones in January, 1994. Jones owned a black, two-year-old male cat named Sugar Ray and a six-to seven-month-old female calico cat named Bonnie. The appellant owned an older male cat that he gave up for adoption because it did not get along well with Jones' cats. Jones testified that the couple had some problems and that their relationship was a little tense. The appellant told Jones he believed she loved the cats more than she loved him, and paid more attention to the cats than to him.

One Sunday in February, the appellant drove Jones to Beaumont to attend a class and returned by himself to Houston. Jones' cats were in good health and spirits when she left. Jones expected to return to Houston after her class ended at 5:00 p.m. the next day.

Nina and Bill Nugent were the couple's landlords and lived downstairs. Nina Nugent testified that on Monday, the appellant was home all day and received no visitors. At approximately 2:00 to 2:30 p.m., she heard one of Jones' cats utter a loud, shrill scream and heard the cats run across the hardwood floor. After looking out the window to verify that the appellant's car was still parked outside, she opened her apartment door and listened as the appellant spoke loudly while the cat still screamed for a minute.

Jones' class ended earlier than expected and she arrived at the duplex about 5:00 p.m. She rang the doorbell and asked the appellant to move his car. He took an inordinate length of time—about two minutes—to come downstairs. When Jones entered the apartment, she saw three sticks of incense burning, unusual because appellant had never before burned incense. The appellant immediately informed her that something was wrong with Sugar Ray—that he was acting skittish and must have "stepped into some dish soap."

Sugar Ray was wet, foaming at the mouth, suffering from diarrhea, and could barely stand up. The skin on his paws was blis-

tered and he was howling in pain. When asked if anything had been spilled into which the cats might have stepped, the appellant said that he thought he might have spilled dishwashing detergent on the kitchen counter, or might have spilled toilet cleaner while cleaning the bathroom. Jones had cleaned the toilet two days earlier. Jones then found Bonnie in the same condition, foaming at the mouth with blisters on her paws.

When Jones called a poison control service, she was told that the symptoms were bizarre. It was suggested that she bathe the cats in case a poisonous substance had gotten into their skin, and she did so. The cats' condition continued to worsen. Jones decided to take them to an emergency clinic. The appellant insisted she was overreacting and suggested if she were to wait, Sugar Ray and Bonnie would "get over it" by morning. At the emergency clinic, veterinarian Mark Rieger saw the cats were in bad shape. They were collapsed and in respiratory distress, and their blue gums indicated a lack of oxygen. He testified the cats had "salivation over them, and they had diarrhea all over themselves." They also had blisters on the bottoms of their feet.

Rieger quickly diagnosed from the dark chocolate color of a blood sample he drew that the cats had ingested acetaminophen (the active ingredient in Tylenol and Excedrin), which is toxic to cats. The cats' symptoms were similar to those he had seen in over a dozen previous cases of acetaminophen poisoning, with the strange exception of the blistered foot pads. Rieger repeatedly asked Jones and the appellant if the cats had ingested Tylenol or another medication and was told that they had not. He administered the antidote for acetaminophen and treated the cats with oxygen and heat pads, but Sugar Ray and Bonnie both died during the night.

Rieger testified that in his opinion, the cause of the cats' death was ingestion of acetaminophen. Two tablets of acetaminophen would be a fatal dose for a cat; normally, the antidote could reverse the effects of two to three times that dosage. Rieger believed the cats had ingested five to six tablets of acetaminophen apiece. Testing at a Texas

A & M laboratory confirmed the existence of acetaminophen in high concentrations. Because of the high level of acetaminophen ingested, Rieger believed it very unlikely that Jones' cats had accidently consumed the poison. In 14 years of emergency veterinary practice, he had never known cats to voluntarily ingest acetaminophen, because of their natural reluctance to swallow pills. Rieger had also never seen multiple cats simultaneously suffer from acetaminophen poisoning.

When Jones returned home she looked around for any spilled cleaning products or pills, but found nothing. She found a capped bottle of Excedrin P.M. in the medicine cabinet. Jones was devastated by the death of her cats but the appellant again suggested that she was overreacting, since it was "just cats" and "they could get some more cats." When she accused him of killing the cats, he told her that he would never do anything that mean. When Jones told him that such conduct suggested mental illness, instead of mere meanness, the appellant became red-faced and very upset, saying, "No, I don't think so. I don't think that would be mentally ill. Do you think people that hunt deer, that hunters are mentally ill?"

Jones asked the appellant to move out of the apartment. While she was packing some of his household items on Friday to expedite the move, Jones opened appellant's microwave oven and was struck by a "very strong odor of burned wet fur and flesh." She asked her brother, Michael Jones, to look in the microwave. When he opened the door, he smelled an odor that was "nauseating" and "turned [his] stomach." He observed hair on the door to the microwave—"more than enough hair ... to assume that there had been an animal in the microwave." Jones took the microwave to the Nugents for safekeeping. Bill Nugent saw "a lot of cat hair ... a big volume of cat hair" on the door to the microwave and stuck in a yellow substance at the top of the oven. Nugent stored the microwave oven in his garage until Michele McClosky, an investigator from the Society for Prevention of Cruelty to Animals, came to inspect it.

McClosky saw a large amount of cat hair stuck to the door, and a smaller amount stuck to the top and sides, along with a yellow substance. She took a photograph of the microwave and placed a sample of its contents in a test tube, but the test tube was later misplaced. She spoke to the appellant on the telephone, and he described the cats as having acted only "blase" and "lethargic." He mentioned seeing Tylenol or acetaminophen in a bathroom cabinet, but not on the floor or "laying around at all." Asked if the cats had been in the microwave, the appellant replied, "That's news to me." He offered no explanation to McClosky regarding any cleaning fluids.

A trace evidence expert employed by the Houston Police Department examined the microwave oven shortly before trial and determined that it contained cat hair. Most of the hairs were white, particularly those stuck to the door. Most of the hairs stuck to the ceiling of the microwave were dark. No hairs from the dead cats were available for comparison purposes. The expert witness testified that she heated a few of her own hairs in a microwave oven to determine whether any effects could be identified, but she observed no damage to the hairs she heated. A forensic serologist took swabs from the other material found in the microwave, but was not able to match it with any of the animal serums to which it was compared. Rieger testified that the blistering on the cats' feet was consistent with their paws having been burned. He stated that the burns were inconsistent with any scenario in which the cats stepped in a cleaning fluid, because the cats would immediately move away to clean their paws. The cats would have suffered burns on their tongues from licking their paws, if the substance were that caustic. In Rieger's opinion, the blisters on the cats' feet were consistent with the cats having been burned in a microwave oven.

The appellant denied committing the offense as alleged in either paragraph of the information. He testified that about the time Nina Nugent heard the cats screaming in the apartment, he observed a "purplish pink spot" on Sugar Ray and attempted to wash the cat in the sink, but it jumped down and ran away. He denied seeing any of the other symptoms described by Jones. Without offering any direct explanation as to what happened to the cats, he testified that he had used several cleaning products while cleaning the bathroom that day. He stated he previously had observed Jones leave Excedrin P.M. either "in" or "on" a bed stand, but said he did not see any pills "laying around the apartment" on the day the cats were poisoned. The appellant did not claim that the cats left the apartment, or that anyone else entered the apartment, on the day in question.

## Torture

◼ In points of error one and two, appellant contends there was legally insufficient evidence to prove that he either placed Jones' cats in the microwave or tortured them. The gist of appellant's argument is that because the cat hair in the microwave was not proved to have come from Jones' cats, nor the burns on their paws proved to have been caused by microwaving, the evidence was legally insufficient to show that he put the cats in the microwave, much less tortured them.

When we determine legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We review cases based on circumstantial evidence using the same standard. *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991).

When viewed in the light most favorable to the verdict, the evidence before the jury showed:

(1) The cats were in good health when Jones left; they were very sick when she returned the following day.

(2) The cats' paws were blistered, sloughing skin, and appeared to the veterinarian to have been burned.

(3) The blistering could have resulted from the cats being subjected to microwaves; it was unlikely to have resulted from their stepping in a caustic substance because a

cat's normal response is to lick off such a substance and their tongues and mouths were not burned.

(4) Appellant was burning three sticks of incense when Jones arrived earlier than expected from her trip. When the microwave oven was opened several days later, it gave off a foul odor, described as "nauseating" and "rank." Jones said it smelled like a "very strong odor of burned wet fur and flesh."

(5) The microwave contained a large volume of cat hair and fluids stuck to the door and interior walls.

(6) Appellant was the only person present in the apartment with the cats. No other cats were alleged to have been in the apartment.

Any theory that a large amount of cat fur was left in the microwave oven by some other cat, or by some process other than torture, is neither reasonable nor consistent with the evidence. A jury could rationally have found from this evidence that appellant tortured the cats in the microwave oven. We overrule appellant's first and second points of error.

## Poisoning

■ In point of error three, appellant argues that the evidence was legally insufficient to prove that he poisoned Jones' cats.

When viewed in the light most favorable to the verdict, the evidence shows:

(1) The cats were in good health when Jones left; they were very sick when she returned the following day. They had diarrhea, were foaming at the mouth, and were too weak to stand.

(2) The veterinarian who treated the cats concluded that they were suffering from acetaminophen poisoning, based upon his observation of their physical symptoms and upon the results of a blood test.

(3) The veterinarian was unable to reverse the results of the poisoning with an antidote. He estimated that the cats had ingested the equivalent of five to six tablets apiece some time during the afternoon of February 21, 1994.

(4) Texas A & M laboratory results confirmed that Sugar Ray and Bonnie died of acetaminophen poisoning.

(5) The veterinarian had seen a dozen cases of feline acetaminophen poisoning in his 14 years of practice, but had never heard of a cat voluntarily ingesting Tylenol, nor had he ever seen a case of multiple cats simultaneously ingesting Tylenol.

(6) Appellant testified there were no pills lying about the apartment the day the cats became sick—pills they could have accidentally ingested. He was the only person present in the apartment with the cats on that day.

The State argues that the ingestion of acetaminophen could *only* have resulted from forcible administration by appellant, not by accidental ingestion. The State relies by analogy on cases in which circumstantial evidence supporting a finding of guilt has been held sufficient when children have been injured by adults responsible for their care. *See Childs v. State,* 837 S.W.2d 822, 824 (Tex.App.—San Antonio 1992, pet. ref'd) (infant's severe head injury could not have occurred accidentally and defendant was only adult present who could have dealt such a strong blow); *Sandow v. State,* 787 S.W.2d 588, 598–99 (Tex.App.—Austin 1990, pet. ref'd) (evidence did not give rise to a reasonable inference that anyone other than defendant caused child's injury, as defendant was sole adult present).

A jury could rationally have found from the evidence that appellant poisoned the cats. We overrule appellant's third point of error.

## Jury Argument

■ In point of error four, appellant contends that the trial court erred by permitting the State to misstate the facts during final jury argument. The disputed portion of final argument was as follows:

*State:* Reidum Helleman, the H.P.D. crime expert, the trace evidence expert, that Mr. Meyer tells you himself we believe, told you that was cat hair in there. She told you there was white cat hair in there. That matches the descriptions of Sugar Ray and Bonnie.

*Mr. Meyer:* Judge, I object to that. The testimony was just the opposite as far as knowing about this hair in relation to the cats that died.

*The Court:* That objection is overruled, Counsel.

■ There are four categories of permissible jury argument: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) response to argument of opposing counsel; and (4) a plea for law enforcement. *Albiar v. State,* 739 S.W.2d 360, 362 (Tex.Crim.App.1987); *Morris v. State,* 755 S.W.2d 505, 509 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd).

The State's argument properly summarized the evidence and made reasonable deductions from the evidence. The prosecutor did not claim that the expert had matched the hairs themselves; she merely remarked that the colors of the hair found by the expert matched the colors of Jones' cats. We overrule appellant's fourth point of error.

We affirm the trial court's conviction.