Dashawn **BROWN** a/k/a Deshawn Brown, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–07–01706–CR.

Court of Appeals of Texas, Dallas.

April 30, 2009.

Rehearing Overruled June 3, 2009.

Kathleen A. Walsh Public Defender's Office, Edgar A. Mason, Dallas, for Appellant.

Craig Watkins, Dallas County Dist. Atty., Lisa Smith, Asst. Dist. Atty., Dallas, for State.

Before Chief Justice THOMAS and Justices MORRIS and FRANCIS.

## OPINION

Opinion By Justice FRANCIS.

After finding Dashawn Brown guilty of cruelty to animals and making an affirmative finding on use of a deadly weapon, a jury assessed punishment at four years in prison and a $5000 fine. In six points of error, appellant challenges the legal and factual sufficiency of the evidence and contends the trial court erred in admitting certain evidence, in interrogating one of the State's witnesses, and in instructing the jury to disregard certain statements. We affirm.

In his first point of error, appellant contends the evidence is legally and factually insufficient to support his conviction. Specifically, he claims there is no evidence he was the person who set the dog, known as "Mercy," on fire. When addressing a legal sufficiency challenge, this Court reviews the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). The reviewing court must give deference to "the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13 (citing *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony and is therefore free to accept or reject any or all evidence presented by either side. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App.2008). In circumstantial evidence cases, it is unnecessary for every fact to point directly and independently to appellant's guilt; "it is enough if the conclusion is warranted by the com-

bined and cumulative force of all the incriminating circumstances." *Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App. 1993) (citing *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Crim.App.1983)).

On a factual sufficiency challenge, we view all the evidence from a neutral perspective. *Roberts v. State,* 220 S.W.3d 521, 524 (Tex.Crim.App.), *cert. denied,* 552 U.S. 920, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007); *Watson v. State,* 204 S.W.3d 404, 415 (Tex. Crim.App.2006). The evidence, though legally sufficient, is factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or if, "considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *Berry v. State,* 233 S.W.3d 847, 854 (Tex.Crim.App. 2007). A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Id.* "The difference between the two standards is that the former requires the reviewing court to defer to the jury's credibility and weight determinations while the latter permits the reviewing court to substitute its judgment for the jury's on these questions 'albeit to a very limited degree.'" *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.Crim.App. 2006), *cert. denied,* 552 U.S. 842, 128 S.Ct. 87, 169 L.Ed.2d 66 (2007) (explaining that factual sufficiency jurisprudence still requires appellate court to afford "due deference" to jury's determination). A factual sufficiency review is "barely distinguishable" from a *Jackson* legal sufficiency review. *Id.*

A person commits the offense of cruelty to animals if he intentionally or knowingly tortures an animal. Tex. Penal Code Ann. § 42.092(b)(1) (Vernon Supp. 2008). Torture includes any act that causes unjustifiable pain or suffering. *Id.* § 42.092(a)(8).

On the evening of April 13, 2006, Willie Cantu returned home from work and took his dog out for a walk. Cantu heard a yelp and, turning around, he saw "an engulfed flame going down the street … a huge flame." After realizing what he had seen was a dog on fire, Cantu ran after the dog, reached her and was able to hold her down. He took off his shirt and used it to pat her down to put out the flames as other men nearby poured liquid on the dog. Cantu was covered in singed hair and an oily substance. He said the smell of singed hair, gasoline, and burned skin was "really bad." A man at the scene recognized the dog and went to find the owner. Shortly thereafter, the dog's owner, identified as appellant, rode up on a bicycle holding a red plastic gas container; appellant appeared calm.

Cantu went back to his apartment to change clothes. When he returned, the police had arrived. The dog was on a rope, and it appeared the officers had tried to put her in their car. Cantu approached the officers and offered to tell them what had happened. They told Cantu they would get his information later, and one officer asked for water and some rags. Cantu assumed the officer was going to give Mercy water, but the officer used the water and rags to clean his car seat. The officers did not ask Cantu to tell them what he had seen but took his name and said someone would call. Cantu went to his apartment and watched as the officers released Mercy to appellant and his girlfriend. Cantu heard the two bickering about not having gas money to take the dog anywhere.

Cantu wrote a statement for Animal Control detailing what he saw that night. On cross-examination, he agreed that unlike his testimony in court, his statement said appellant rode up on the bicycle after the police arrived. Cantu also said he did

not know the dog's real name but had heard the name "Mercy" from the media and used it in his statement to Animal Control.

Forest Pyle, a friend of appellant's cousin, Kevin, knew appellant and, during the spring of 2006, occasionally "hung out" with Kevin and appellant at the Rock Creek Apartments where appellant lived. Pyle also knew appellant's girlfriend, Megan, and believed she lived with appellant. According to Pyle, appellant and Megan had a female pit bull dog. On April 13, 2006, Pyle went to the apartments twice, the first time around six in the evening. Appellant had been drinking. He said he was mad because the dog would not breed. Pyle was present when appellant was talking with his brother, Lee, and said he was going to kill the dog. When the dog walked up to appellant, he grabbed her by the collar and dragged her behind a trash dumpster. Appellant had a knife in his hand. Pyle heard a yelp and saw the dog run out from behind the dumpster; she had blood on her side. Appellant walked out from behind the dumpster, threw the knife down, and walked away. Pyle left to visit his girlfriend and when he returned to the apartments later that night, the dog had been burned.

Rock Creek Apartments resident Ricky Lee Vazquez was outside with a neighbor, Luis Barron, drinking beer and talking when they heard a loud scream and saw a ball of fire. When they realized the ball of fire was actually a dog, Vazquez ran back to get his beer and poured it on the dog to douse the flames. Barron took his shirt off and put it on the dog. The dog was "hurting real bad." Vazquez said the smell of "flesh and hair burning at the same time" was "real bad." Vazquez recalled that he and Barron were the only ones in the area. Angry and wanting to find who had done this to the dog, Barron picked up a couple of rocks and was carry-ing them in his hands as the two men walked around the area. When they saw appellant walking down some stairs holding a red gas can, Vazquez said, "Hey, are you the one that burned that dog?" to which appellant replied, "Well, where's that piece of shit dog at?" Barron asked if the dog was appellant's, and appellant responded by asking where his "fucking dog" was. As Barron and Vazquez walked back to the area where the dog was, appellant followed on a bicycle still carrying the red gas can. Barron coaxed the dog out of some bushes. Appellant tried to take her away, but Barron told appellant he was not going to let him take the dog. At that point, Vazquez decided to call 911.

Vazquez told the jury that when the police arrived, one of the officers opened the car door and got out, and the dog jumped in the car. Vazquez said the officer was annoyed because the dog was bleeding and got the car seat dirty. The officer asked for some towels to clean the car. Barron got the dog out of the car and tied her to a pillar by the carport. Some of appellant's friends showed up and were telling the police to let appellant have his dog. When appellant's girlfriend Megan arrived, she saw the dog, approached her, and tried to pet her. Megan began crying. According to Vazquez, the dog was her pet. Although everyone in the crowd seemed upset at what happened to the dog, appellant appeared not to care. Megan went over to appellant, and although Vazquez could not hear the conversation, he could tell she was not happy with appellant. The police left the dog with appellant and Megan.

Days later, flyers were posted at the complex asking residents with knowledge of the attack to contact Animal Control. Vazquez did and made a statement. On cross-examination, Vazquez stated he thought appellant set the dog on fire in his

apartment but conceded this would not be feasible because it would likely set the apartment on fire. He did not hear any smoke alarms or fire alarms that night.

The morning after the incident, Austin Holt was looking out his window when he saw a dog he later identified as Mercy walk by his apartment toward the woods behind the complex. He went outside and called, "[P]uppy, puppy" to get her to come to him. After about twenty minutes, Mercy slowly made her way to him. According to Holt, she was "damaged," but he thought she might have mange. Holt tied a rope to the collar in order to tether Mercy to his fence. He gave her water and some food, but she would not eat or drink. Holt called his friends as well as numerous shelters in the area to ask what he could do to help Mercy or where he could take her. Finally, his friend Adam offered to help. Adam drove to the apartment complex, and the two men loaded Mercy into the cab of Adam's truck. They drove to Operation Kindness where workers took Mercy immediately. Holt spent about three or four hours with Mercy and described her as "very docile."

Apartment resident Amber Moore told the jury she was having drinks on her balcony with some friends that same day. Appellant came to her apartment and after a few minutes, Moore asked appellant if he had burned the dog. Appellant said, "Fuck that bitch."

Captain Marcus Stephenson, an arson investigator with the Dallas Fire Department, reviewed witness statements, the medical records, and photographs while investigating the dog burning. According to Stephenson, an accelerant was used on Mercy and, because the heaviest concentration was on the underside of the dog, she was likely lying on her back at the time the accelerant was poured on her. He also stated the fire was likely set near where the dog was first discovered.

Veterinarian Troy Lindsay was working at the Brookhaven Pet Hospital where Mercy was initially taken. Dr. Lindsay described Mercy as a female pit bull between twelve to eighteen months old. He said numerous burn wounds covered her body, particularly the ears, chest, armpits, and flanks under her legs. She had two puncture wounds behind her right front leg and chest. Mercy's whiskers had been burned off, and the skin on her ears was severely burned. Dr. Lindsay said he believed Mercy would lose her ears from the burns. She had a hematoma on one ear where the blood was caught between burned skin and cartilage. Most of her hair had burned off, and the skin that burned was leathery in appearance. Despite her pain, Mercy showed no signs of aggression to the staff during her stay at the hospital. Mercy was referred to the Dallas Veterinary Surgical Center (DVSC) for more specialized treatment.

Dr. Katherine Wells is a veterinarian who specializes in pain management at the DVSC. Mercy was treated at the DVSC from April 17 until April 23. According to Dr. Wells, about 60% of Mercy's body had been burned, most severely on the inside of her thighs, the vulva region, and her abdominal surface. Initially, her burn injuries appeared superficial but with each passing day, the severity of the wounds became more evident. Both of Mercy's ears were sloughing and ultimately were amputated. Each day, Mercy was anesthetized and any unhealthy, dying, or dead tissue was removed. The remaining tissue or skin was flushed and cleaned in an attempt to prevent bacterial infection. Mercy was wrapped in "wet to dry bandages" to prevent bacteria from entering the wound and to keep the fluid from leaking out of the wound. In addition, Mercy was rehydrated, fed through an esophagostomy tube, and given pain medications. Dr. Wells said Mercy was not

aggressive. Despite the efforts of Dr. Wells and the DVSC staff, Mercy died on April 23 of complications from her severe burn wounds.

Viewed in the light most favorable to the judgment, the evidence shows appellant said he was going to kill the dog and stabbed her with a knife, causing her to yelp in pain and bleed. Later that night, several people saw appellant's dog engulfed in flames and tried to help her by extinguishing the flames. Appellant was seen shortly thereafter carrying a red gas can and, when asked about the animal, referred to her as "that piece of shit dog." Appellant did not appear upset Mercy had been burned. Although the police released the dog to him, appellant did not take Mercy to a veterinarian for treatment. The following day, Mercy was found wandering around in the wooded area behind the apartment complex and was taken by strangers to Operation Kindness who in turn took her to a veterinarian for treatment. That same day, appellant was asked whether he hurt the dog and he responded, "Fuck that bitch." Despite medical treatment, Mercy later died of complications from the burn wounds. Although no one testified to seeing appellant set Mercy on fire, the combined and cumulative force of all the incriminating evidence is legally sufficient for a reasonable jury to conclude beyond a reasonable doubt that appellant was the person who tortured Mercy.

Furthermore, after reviewing all the evidence in this case and giving due deference to the fact finder's assessment of the witnesses' credibility and resolution of evidentiary conflicts, we cannot conclude the great weight and preponderance of evidence contradicts the verdict. Because the fact finder was rationally justified in finding guilt beyond a reasonable doubt, we conclude the evidence is factually sufficient to support appellant's conviction.

We overrule appellant's first point of error.

■ In his second and third points, appellant claims the trial court erred in admitting Pyle's written statement to Animal Services and his grand jury testimony because the State failed to show Pyle had "insufficient recollection" to enable him to testify and failed to show the grand jury testimony was made at or near the time of the event. Appellant concedes the evidence was admissible but argues it was admissible only as impeachment evidence and therefore the jury should have been instructed to consider it only for impeachment purposes and not for the truth of the matter.

■ We review the decision to admit evidence under an abuse of discretion standard and will not reverse that decision absent a clear abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex.Crim.App.2008); *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001). " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Hearsay statements are not admissible unless they fall within a recognized exception to the hearsay rule. *See* TEX. R. EVID. 802; *McCarty*, 257 S.W.3d at 239. Rule 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> **(5) Recorded Recollection.** A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly, un-

less the circumstances of preparation cast doubt on the document's trustworthiness. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tex. R. Evid. 803(5). Thus, for a statement to be admissible under rule 803(5), the witness must have had firsthand knowledge of the event, the statement must be an original memorandum made at or near the time of the event while the witness had a clear and accurate memory of it, the witness must lack a present recollection of the event, and the witness must vouch for the accuracy of the written memorandum. *Johnson v. State*, 967 S.W.2d 410, 416 (Tex.Crim.App.1998).

Although appellant complains on appeal that the written statement and grand jury testimony were admissible only under evidentiary rule 613 and not under rule 803(5), we cannot agree. At trial, seventeen-year-old Pyle testified he is a friend of appellant's cousin, Kevin. For about two months, Pyle and Kevin went to Rock Creek Apartments three times a week to hang out with appellant. Pyle knew appellant had a pit bull. On April 13, Pyle went to the apartment complex around 6 p.m. and saw Kevin, appellant, and appellant's brother, Lee. According to Pyle, appellant had been drinking but "he wasn't too agitated at the time."

When the prosecutor asked Pyle if, at some point, appellant's mood changed, Pyle responded, "Not that I remember." The prosecutor instructed Pyle to look at his written statement to refresh his memory. After Pyle did so, the prosecutor again asked if appellant's mood changed. Pyle replied, "Still, not that I remember, sir." The prosecutor then asked if Pyle saw Mercy with appellant. Pyle stated he did but it was when he went to the apartments the second time after visiting his girlfriend. When asked if he remembered seeing Mercy during his first visit, Pyle said he did not. He also said he did not remember the events of that night very well.

The prosecutor indicated he intended to offer Pyle's written statement under evidentiary rule 803(5). He asked Pyle if he remembered making a written statement to Animal Services about the day in question. Pyle said he did, and in response to further questioning by the prosecutor, Pyle said the statement was in his handwriting and was made roughly two weeks after the incident. Shortly thereafter, the prosecutor sought to introduce Pyle's grand jury testimony. Appellant specifically objected that the grand jury testimony did not meet the requirement that Pyle made the statement "at or near the time of the event." The trial court overruled the objection noting Pyle testified before the grand jury one month after the event.

The record shows Pyle had firsthand knowledge of the event because he knew appellant and was present on April 13, 2006, the day Mercy was burned. His written statement to Animal Services was dated April 25, 2006, and he testified before the grand jury on May 16, 2006, approximately one month after the event. In response to many of the prosecutor's questions, Pyle repeatedly stated he could not remember or did not remember the events of that day. The trial court found and the record supports the finding that Pyle lacked a present recollection of the event at trial and his grand jury testimony was made close in time to the event. Under these circumstances, we cannot conclude the trial court erred in allowing Pyle's written statement and grand jury testimony to be read into evidence under rule 803(5). Because the statements were not offered for the purpose of impeachment, we likewise conclude the trial court did not

**614**

err in failing to instruct the jury to consider the statements for impeachment. We overrule appellant's second and third points.

◼ In his fourth point of error, appellant claims the trial court erred in interrogating the State's witness, Cantu, during appellant's cross-examination. Appellant contends the trial court's questions constituted a comment on the weight of the evidence.

During cross-examination, defense counsel asked Cantu if he knew Barron or Vazquez. Cantu said he did not. Defense counsel asked if either of those names appeared in the written statement Cantu made for Animal Services. Cantu said they did not and that he had never met those people before. The following then occurred:

> DEFENSE: Did Mr. Vazquez take his shirt off and try to put the dog out too?
>
> CANTU: Um, I'm not sure. Probably.
>
> STATE: Judge,—
>
> DEFENSE: I'm not sure—
>
> STATE: —he just testified he didn't know those names.
>
> COURT: Okay. The individuals that were there with you, did any of them take their shirts off and help put out the dog on fire?
>
> DEFENSE: Objection. The Court is asking a direct question that's the subject of cross-examination.
>
> COURT: Overruled. What's the answer to that, sir?
>
> CANTU: Uh no, not to my knowledge.

◼ Appellant did not object to the trial court's question on the ground it constituted a comment on the weight of the evidence. If a party asserts a different complaint on appeal than was made by objection at trial, the issue is waived. *Rezac v. State,* 782 S.W.2d 869, 870 (Tex. Crim.App.1990); *Jones v. State,* 111

S.W.3d 600, 604 (Tex.App.-Dallas 2003, pet. ref'd). Because appellant's complaint on appeal does not comport with his objection below, he has waived this issue. We overrule appellant's fourth point.

◼ In his fifth point, appellant contends the trial court erred when it denied appellant's request to instruct the jury to disregard Vasquez's statement that the burning of Mercy was not an accident. Appellant claims this was the "only evidence adduced that the burning was not the result of an accident" and the failure to instruct the jury to disregard the comment constitutes reversible error. Assuming the trial court erred in denying appellant's request for an instruction to disregard, we cannot conclude appellant is entitled to reversal.

◼◼ Texas Rule of Appellate Procedure 44.2(b) states we must disregard a nonconstitutional error that does not affect a criminal defendant's substantial rights. Under this rule, as an appellate court, we may not reverse for nonconstitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. TEX. R. APP. P. 44.2(b); *Garcia v. State,* 126 S.W.3d 921, 927 (Tex. Crim.App.2004). In assessing the likelihood that the jury's decision was adversely affected by the error, we should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error. *Haley v.*

*State,* 173 S.W.3d 510, 518–19 (Tex.Crim. App.2005).

After examining the record as a whole, we conclude the error in question did not have a substantial and injurious effect or influence in determining the jury's verdict. As detailed above, there was considerable evidence in the approximately one-thousand-page trial record in addition to 165 exhibits from which the jury could have concluded Mercy's burning was not an accident. *See Garcia,* 126 S.W.3d at 927; *Oveal v. State,* 164 S.W.3d 735, 746 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd). The error, if any, in not instructing the jury to disregard Vasquez's statement had only a slight or no effect on the jury's verdict in this case. We overrule the fifth point of error.

■ In his final point, appellant claims the trial court erred in sua sponte instructing the jury to disregard a statement made by one of appellant's witnesses during punishment. The State argues the statement was not proper because it was "evidence that would exonerate defendant" and was therefore not relevant to punishment.

During punishment, Bradley McClendon testified for appellant. He said he did not see appellant "harm that Pit Bull in any way, shape, or form" nor did he ever see appellant kick Mercy. The following then occurred:

> DEFENSE: Do you believe it's actually within him to have burned that dog?
>
> WITNESS: Not at all.
>
> COURT: The jury will disregard that line.

Appellant objected to "any instructions that are not requested by counsel."

On appeal, appellant complains the trial court's instruction constituted a comment on the weight of the evidence. This complaint does not comport with appellant's objection below. Therefore, we conclude appellant waived this argument. *See Re-*

*zac,* 782 S.W.2d at 870; *Jones,* 111 S.W.3d at 604.

■ Furthermore, even assuming appellant properly preserved this issue, we would nevertheless conclude the trial court's instruction to the jury did not have a substantial and injurious effect on appellant. The jury found appellant guilty after several days of detailed testimony, including over seventy graphic photos of Mercy and her extensive burn injuries. The punishment range was two to ten years. The jury sentenced appellant to four years, on the lower end of the punishment range. In light of the facts of this case and the extensive record before us, we conclude the trial court's isolated instruction did not influence the jury's verdict as to punishment. *See* Tex. R. App. P. 44.2(b). We overrule the sixth point of error.

We affirm the trial court's judgment.