**Opinion filed September 2, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00342-CR

_____

### SHAWN MARIE MCKENZIE-POLK, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 161st District Court**

**Ector County, Texas**

**Trial Court Cause No. B-17-0424-CR**

## M E M O R A N D U M   O P I N I O N

In a three count reindictment, Appellant, Shawn Marie McKenzie-Polk, was charged with the first-degree felony offense of burglary of a habitation with the intent to commit the felony offense of arson (Count One), TEX. PENAL CODE ANN. § 30.02(a)(1), (d) (West 2019), the first-degree felony offense of arson (Count Two), *id.* § 28.02(a)(2)(A), (d)(2), and the third-degree felony offense of

cruelty to nonlivestock animals (Count Three), *id.* § 42.092(b)(1), (c-1). The reindictment further alleged that all of the indicted offenses occurred within the same criminal episode. The jury convicted Appellant of each indicted offense and assessed her punishment at (1) ten years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice (IDTDCJ) for Count One, (2) ten years' imprisonment in the IDTDCJ for Count Two, and (3) six years' imprisonment in the IDTDCJ and a $500 fine for Count Three. The trial court sentenced Appellant accordingly and ordered the sentences to run concurrently.

Appellant's first appointed appellate counsel submitted an *Anders* brief and filed a motion to withdraw.[1] After an independent review of the record, we found that this appeal, which stems from a contested trial based largely on circumstantial evidence, was not particularly amenable to a disposition under *Anders*. We granted appellate counsel's motion to withdraw, abated the appeal, and remanded this cause to the trial court for appointment of other appellate counsel. On appeal, Appellant now challenges the sufficiency of the evidence to support her convictions. We affirm.

## I. *Factual Background*

Appellant's convictions arise from a single event: a fire that caused substantial damage to the home of Sean Thomason and his then-fiancée (now wife), Angela Arnason. At the time of the fire, Sean had been engaged to Angela for approximately five years, and the couple had lived in the home together in Odessa with their son, A.C.; daughter, C.T.; their two cats, Whiskers and Peaches; and their three dogs, Carmel, Rocky, and Daisey. Sean and Angela knew Appellant because Sean worked with Appellant's husband, Dan, and the two couples frequently spent time together

---

[1]*See Anders v. California*, 386 U.S. 738 (1967).

at each other's homes. Angela had also invited Appellant to participate in her and Sean's upcoming wedding.

Over time, Appellant and Sean became intimate and engaged in a short-lived extramarital affair. Approximately two weeks before the fire, Sean ended the affair with Appellant. According to Sean, Appellant was enraged; she told him that he was "throw[ing] her away like a piece of trash." Appellant also threatened that she would "get" him. When Sean asked what "get" him meant, Appellant declared that he "would find out."

Two weeks after this exchange, and on the day of the fire, Sean left their home at around 6:00 a.m. to go to work. Angela left for work around 6:30 a.m. While at work, Sean received a call from Omar Galindo of the City of Odessa fire marshal's office and was told that his house was on fire. Sean testified that he attempted to call Angela but could not reach her; he then called Appellant, because she was the person who was nearest to Angela at the time, and asked Appellant to alert Angela that their house was on fire. When Sean arrived at the scene of the fire, Appellant was already there.

The entire interior of the house sustained extensive smoke damage. Captain Rex Scown of the Odessa Fire Department testified that, when he entered the house through the front door, he observed "heavy smoke and heat" inside. Captain Scown suspected that the fire had been caused by arson because there appeared to be multiple points of origin.

Galindo began investigating the source of the fire immediately after it was extinguished. He found several deceased animals in the house. He testified that he believed the origin of the fire was arson and that the arsonist was a person who knew the homeowners and was familiar with the house and the animals that lived there. It was determined that the fire had two points of origin: (1) the den next to the kitchen

and (2) the master bedroom.  He further testified that, in his experience, it was uncommon for people to burn down their own house.

After the fire was extinguished, Sean and Angela walked through the house and observed that various drawers and cabinets were open and appeared as if they had been "rummaged through."  In the bedroom, several of Sean and Angela's undergarments were strewn around the room, and others had been burned and were in a pile on the floor.  In the bedroom and the kitchen, paper and plastic wedding decorations that Sean and Angela had kept stored in their house for their upcoming wedding were burned.  Angela also testified that two jewelry boxes that had been in their house that morning were missing.

Sean and Angela's thirteen-year-old son, A.C., testified that he was the last person to leave their house on the morning of the fire.  When he departed, three pets—Carmel, Whiskers, and Peaches—were inside the house.  The remains of these three pets were found inside the house after the fire.

Galindo interviewed Sean and Angela after the fire.  Because arson appeared to be the likely cause of the fire, Galindo asked Sean and Angela if either of them had engaged in an illicit extramarital affair.  At the time, Angela was unaware of Sean and Appellant's previous affair; therefore, Sean did not disclose the affair to Galindo because he was afraid he would lose his family.  Sean did not suspect Appellant to be the arsonist at the time of the interview.  However, he testified that he later began to suspect that Appellant was involved based on her subsequent behavior.  Five or six days later, Sean told Angela about his affair with Appellant. Sean and Angela thereafter contacted Galindo and informed him of the affair and their suspicions of Appellant.

Sometime after this, Detective Josh Aguilar of the Odessa Police Department called Angela and asked her to come to the police station to look at some jewelry

items that had recently been turned in to the police. The jewelry had been delivered to the police by Kelsey Mote, Appellant's daughter. Angela did so and recognized that every piece of jewelry that was shown to her was her property; however, she did not recognize the purse in which they were contained.

At the time of the fire, Kelsey, her husband (Ryan Mote), and their three-year-old daughter lived in Appellant's house. Kelsey and Ryan testified that on the morning of the fire, Appellant awakened them to tell them that Sean's house was on fire. Ryan then drove Appellant to Sean's house. When Appellant returned to her house, Ryan and Kelsey thought that Appellant appeared nervous and anxious. Appellant repeatedly searched the contents of her cell phone and asked them numerous questions about whether anyone could find out where she had been that day. Kelsey and Ryan testified that Appellant constantly talked about concealing and deleting entries and other information from her cell phone; Appellant also said that she had removed "everything" from her phone, wanted to reset it, and wanted to do the same with her computer.

Kelsey testified that Appellant told her that, if anyone asked, Kelsey needed to say that Appellant had been at home with her and Ryan the morning of the fire. Kelsey understood this to mean that Appellant was asking her to be untruthful because Kelsey did not know if Appellant had been home that morning before Kelsey was awakened. Ryan and Kelsey also noticed that the pickup that Appellant typically drove appeared to have been moved that morning. It had been raining, and the tires were muddy.

After Detective Aguilar learned about Sean and Appellant's affair, he interviewed Appellant. Detective Aguilar used various deceptive techniques during the interview; he told Appellant that surveillance video existed that showed that she had committed arson, which was untrue. He also told Appellant that if she was under

the influence of a drug, such as Ambien, at the time, she would not be responsible for the fire, which was also untrue. Detective Aguilar testified that using deceptive techniques during interviews would often cause a guilty person to confess. He stated that, in his opinion, suspects who are innocent would typically deny their involvement immediately. During the interview, Appellant refused to confirm or deny her involvement in the fire; instead, she often equivocated with responses such as "I don't know." Appellant also refused to confirm or deny that she had engaged in an extramarital affair with Sean. Based on the results of Appellant's interview, Detective Aguilar's suspicions of Appellant's involvement in the fire increased significantly.

Law enforcement personnel subsequently obtained a warrant to search Appellant's house. Officers seized some phones and other electronic equipment from Appellant's house but did not discover any jewelry. While the search was ongoing, Ryan and Kelsey sat on a couch in the living room. Kelsey testified that the officers did not search under that couch. Nevertheless, Kelsey's brother, Keaton McKenzie-Polk, testified that the officers did look under the couch. Ryan and Kelsey also testified that, after the officers left, Appellant smiled and said that the officers "didn't find what they were looking for"; she appeared to be noticeably upbeat and was laughing and smirking in a "smart aleck" manner. Later, Appellant was arrested pursuant to an arrest warrant.

Sometime after Appellant's arrest, Kelsey and Ryan's three-year-old daughter discovered a purse filled with jewelry underneath the living room couch in Appellant's house. Kelsey did not recognize the jewelry and did not believe that it belonged to Appellant. Kelsey showed the jewelry to Keaton. Despite Keaton's testimony that the items in the purse belonged to him and Appellant, Kelsey testified that Keaton told her to discard the jewelry and the purse. Instead, Kelsey took the

purse and jewelry to the police station where Angela later identified the jewelry as the jewelry that had been stolen from her home. Detective Aguilar testified that, when the search warrant was being executed, to his knowledge, no officers searched under the couch where the purse filled with jewelry had been found. Kelsey further testified that although she and Appellant had a troubled relationship, the status of their relationship would not cause her to testify untruthfully.

Sean and Angela testified that they were not in severe financial distress. Their house was only titled in Sean's name because he had better credit than Angela. Sean and Angela's homeowners' insurance company paid $142,558.00 directly to the company that rebuilt their house. They also received "about $40,000" in insurance proceeds to reimburse them for the contents of their house that was either damaged or destroyed. Sean and Angela temporarily separated after these events because of Sean's infidelity. Sean testified that, after the house was rebuilt, the family sold it and moved away because the memory of their lost pets was too painful for them to remain living in the same house. Sean also testified that they made a profit on the sale of the house, but they used the profit to pay overdue bills.

## II. *Standard of Review – Sufficiency of the Evidence*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d

7

729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*,

8

214 S.W.3d at 13. Instead, the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

Appellant's convictions are all predicated on her commission of arson. On appeal, Appellant contends that the State failed to prove (1) that she was responsible for starting the fire that damaged Sean and Angela's house and its contents and also resulted in the death of three of their pets and (2) that, because each conviction is predicated on the evidence that she started the fire, the evidence is insufficient to support all of her convictions.

To prove the offense of burglary as alleged in the reindictment in this case, the State was required to establish that Appellant entered a habitation, without the effective consent of the owner, with the intent to commit a felony (here, arson). *See* PENAL § 30.02(a)(1). Thus, to prove the charged offense of burglary, the State was required to show that Appellant intended to commit the offense of arson. To prove arson as alleged in the reindictment, the State was required to establish that Appellant started a fire with the intent to destroy or damage a habitation (Sean and Angela's house) and knowing that the habitation was within the incorporated city limits of Odessa, Texas. *See* PENAL § 28.02(a)(2)(A); *see Mosher v. State*, 901 S.W.2d 547, 549 (Tex. App.—El Paso 1995, no pet.) ("To establish the corpus delicti in arson cases it is necessary to show that a fire occurred and that the fire was designedly set by someone."). The offense of arson becomes a first-degree felony if the property intended to be damaged or destroyed by the arsonist is a habitation. PENAL § 28.02(d)(2).

To prove the offense of cruelty to nonlivestock animals as alleged in the reindictment, the State was required to show that Appellant intentionally, knowingly, or recklessly tortured or in a cruel manner killed an animal or animals by setting Sean and Angela's house on fire when Appellant knew that animals were present in the house at the time. *See id.* § 42.092(b)(1). A person acts recklessly when she is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances surrounding her conduct exist or the result of her conduct will occur. *Id*. § 6.03. "Torture" includes "any act that causes unjustifiable pain or suffering." *Id.* § 42.092(a)(8). "Cruel manner" includes a manner that "causes or permits unjustified or unwarranted pain or suffering." *Id.* § 42.092(a)(3).

In support of Appellant's contention that the evidence is insufficient to prove that she started the fire, and thus committed arson, Appellant emphasizes that only an isolated piece of evidence—the jewelry—links her to the time and place of the fire. Appellant attempts to cast doubt on the origin of the tan purse in which the jewelry was allegedly discovered by Kelsey and Ryan several days after Appellant had been arrested. Importantly, Appellant asserts that the jewelry items were never positively identified by the putative owner, Angela, as being her property. As such, according to Appellant, under the applicable sufficiency standard of review, even if the jury believed that the jewelry belonged to Angela based on nothing more than the unfounded suspicions of Kelsey and Ryan, our task is to determine whether the jury's belief in that suspicion was reasonable, and not merely speculative.

We disagree with Appellant's characterization of Angela's testimony regarding the identification and ownership of the jewelry that was found in a purse in Appellant's house and later delivered by Kelsey to the Odessa Police Department. Contrary to Appellant's assertion, Angela testified that when she inspected the jewelry at the police station, she recognized and identified every piece of jewelry

10

that was in the purse as hers. Angela positively identified the jewelry again when she testified at trial, and she provided details about several of the jewelry items that had been taken, such as the occasions on which she acquired them and specific details about their personal significance to her. Angela further testified that, when she left the house for work on the morning of the fire, the jewelry box that contained her jewelry and other items was located on her dresser. After the fire, the jewelry box was missing.

Angela's testimony, taken together with Kelsey's and Ryan's testimony, would permit a rational jury to reasonably infer that the unexplained presence of the jewelry in Appellant's home after the fire was indicative of her presence in Sean and Angela's home on the date that the fire was set. This evidence, together with other circumstantial evidence of Appellant's guilt—namely, (1) her motive, as Sean's spurned lover, to "get" him and burn down his house, (2) evidence that wedding materials stored in Sean and Angela's home were used to start the fire, (3) Kelsey's and Ryan's testimony concerning Appellant's suspicious and nervous behavior immediately after the fire and her jovial reactions after the police searched her home because the police "didn't find what they were looking for" during the search, (4) Appellant's request to Kelsey to verify that Appellant was at home when the fire began, (5) Appellant's attempts to conceal or destroy entries and data on her cell phone and computer, and (6) Appellant's evasive and inconsistent interview responses to Detective Aguilar—indicates that sufficient circumstantial evidence existed to support the jury's inference that Appellant committed arson. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to police are probative of wrongful conduct and are also circumstances of guilt."); *Orr v. State*, 306 S.W.3d 380, 394 (Tex. App.—Fort Worth 2010, no pet.) ("A jury

11

may infer intent from any facts that tend to prove [arson], such as acts, words, and conduct of the defendant." (citing *Christenson v. State*, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd))); *see also Hooper*, 214 S.W.3d at 13.

Appellant's primary argument concerning her burglary conviction is that, because the evidence is insufficient to support her conviction for arson, it is necessarily insufficient to support her conviction for burglary—that is, the evidence does not support the conclusion that Appellant entered Sean and Angela's home with the intent to commit arson. Beyond her claim that the evidence to support a charge of arson is lacking, Appellant does not challenge any other aspect of her burglary conviction. In this case, the evidence of arson, which we have already discussed, also necessarily and sufficiently supports the jury's inference that Appellant committed burglary with intent to commit arson.

Now turning to Appellant's third conviction—cruelty to nonlivestock animals—Appellant contends, in addition to her arson argument, that because there is no evidence as to the manner in which the animals perished, the State has failed to prove that she caused their deaths in a "cruel manner."

Here, the State adduced evidence that Appellant was close friends with Sean and Angela and had been to their house on many occasions before the fire; she was also familiar with their pets. Sean and Angela's thirteen-year-old son, A.C., testified that he was the last person to leave the house on the morning of the fire. When he departed, three pets—Carmel, Whiskers, and Peaches—were inside the house. The bodies of these three pets were found inside the home after the fire had been extinguished. Moreover, the entire interior of the house sustained smoke damage. Captain Scown testified that, when he entered the house through the front door, he observed "heavy smoke and heat" inside. Although no medical or forensic evidence was presented as to the cause of death of the pets, given the amount of smoke in the

house as observed by the firefighters during the fire and as it was being extinguished, and because the entire interior of the house was damaged by the smoke, the jury could have reasonably inferred that Carmel, Whiskers, and Peaches died from either smoke inhalation or heat exposure. *See Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) ("[T]he trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence.").

Thus, when taken together with the abundance of circumstantial evidence, and other direct evidence, that indicated that Appellant was responsible for setting the fire that burned and damaged Sean and Angela's house, this evidence is sufficient to support, at minimum, the jury's inference that Appellant's conduct recklessly caused the deaths of Carmel, Peaches, and Whiskers in a manner that caused unjustifiable or unwarranted pain or suffering. *See Brown v. State*, 333 S.W.3d 606 (Tex. App.—Dallas 2009, no pet.) (holding that circumstantial evidence showing that a defendant had intentionally set his pet dog on fire was sufficient to support the defendant's conviction for cruelty to nonlivestock animals under Section 42.092(b)(1)); *Celinski v. State*, 911 S.W.2d 177 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (holding that circumstantial evidence showing that the defendant had intentionally put his two pet cats in his microwave and caused them to be burned, as well as poisoning them with drugs, was sufficient to support his conviction of cruelty to nonlivestock animals under Section 42.092(b)(1)).

Appellant further argues that the same evidence that supports her convictions could also, circumstantially, support an inference that Sean torched his own house in order to realize a financial profit. For example, Sean testified that he made a small profit when the family sold their house after it was rebuilt. Sean also purchased some personal items with the "loss of contents" insurance proceeds that he and

Angela received from their homeowners' insurer. Appellant asserts that, at best, only circumstantial evidence links her to the fire—there is no direct evidence that, after Sean, Angela, and A.C. left the house in the morning, Appellant, or anyone else, went to the house until after the fire was already raging. Thus, according to Appellant, Sean had the motive and opportunity to torch his own house, and there is no direct evidence that Appellant was ever at the house that day before the fire started.

The jury is authorized to believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. However, as the trier of fact, it is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. It is not our role or function to engage in or make credibility determinations; the jury is entitled to deference on these questions. *See Jackson*, 443 U.S. at 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. Therefore, when the evidence in the record supports conflicting inferences, we presume that the factfinder resolved any conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

Consistent with the applicable standard of review, we have carefully reviewed all of the evidence in the light most favorable to the jury's verdicts. Irrespective of Appellant's contentions, we find that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of burglary of a habitation, arson, and cruelty to nonlivestock animals, as charged in the reindictment. Accordingly,

14

because sufficient evidence supports Appellant's convictions for the charged offenses, we overrule Appellant's sole issue on appeal.

## IV. *Modification of Judgments*

We note that the judgment for Count One and the nunc pro tunc judgment for Count Three contain nonreversible errors and must be modified. In the judgment for Count One (Appellant's conviction for burglary of a habitation with the intent to commit the felony offense of arson), the trial court ordered Appellant to pay court costs, including a Time Payment Fee of $25 which is also listed in the district clerk's bill of cost. In light of the Court of Criminal Appeals recent opinion in *Dulin*, we conclude that the time payment fee must be struck in its entirety as prematurely assessed. *See Dulin v. State*, 620 S.W.3d 129, 133 & n.29 (Tex. Crim. App. 2021). When, as in this case, the trial court erroneously includes fees as court costs, we should modify the trial court's judgment to remove the improperly assessed fees. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013).

Accordingly, we modify the trial court's judgment for Count One and the attached bill of costs to delete the time payment fee of $25, without prejudice to a time payment fee being assessed later "if, more than 30 days after the issuance of the appellate mandate, [Appellant] has failed to completely pay any fine, court costs, or restitution that [she] owes." *See Dulin*, 620 S.W.3d at 133.

Finally, the trial court's nunc pro tunc judgment for Count Three (Appellant's conviction for cruelty to nonlivestock animals) incorrectly recites the applicable Penal Code provision for the charged offense. We have the authority to modify and reform judgments when necessary. TEX. R. APP. P. 43.2(b); *see Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Therefore, we must reform an incorrect judgment "to make the record speak the truth" when we have the necessary

information to do so.  *See Bigley*, 865 S.W.2d at 27–28; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992).

Here, the nunc pro tunc judgment for Count Three recites that Appellant was indicted under Section 42.092(c) of the Penal Code.  The reindictment in this case, and the evidence adduced at trial, show that Appellant was indicted for and convicted of the third-degree felony offense of cruelty to nonlivestock animals.  *See* PENAL §§ 42.092(b)(1), (c-1).

Accordingly, we modify the trial court's nunc pro tunc judgment for Count Three to recite that the "Statute for Offense" for which Appellant was convicted is "42.092(b)(1), Penal Code."

### V. *This Court's Ruling*

As modified, we affirm the judgments of the trial court.  *See* TEX. R. APP. P. 43.2(b).

W. STACY TROTTER
JUSTICE

September 2, 2021

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.